Ex parte JAMES A. POPE.

No. A-5721.   Opinion Filed Dec. 19, 1925.
(242 Pac. 290.)

**6**

Robert Burns, for petitioner.

Geo. F. Short, Atty. Gen., and J. Berry King, G. B. Fulton, and Leon S. Hirsh, Asst. Attys. Gen., for respondent.

Nathan Wm. MacChesney and MacChesney & Becker, amici curiae.

BESSEY, P. J.  The petitioner, James A. Pope, says he is illegally restrained of his liberty by the sheriff of Oklahoma county, upon a warrant of arrest issued by the county court of said county, charging the petitioner with having committed the offense of acting as a real estate broker without a license, in that he negotiated a lease on certain hotel property  in  Oklahoma City, for which he charged and received a real estate broker's fee of $242, in violation of the provisions of chapter 129, Session Laws of 1925.

The petitioner says this act is unconstitutional and void, in that it undertakes to unreasonably burden and regulate a legitimate business, not subject to police regulation; that the enforcement of the act will, in effect, deprive the petitioner of the free right of contract, and amount to the taking of his property without due process of law; that the fees and fines therein provided, if paid by the petitioner, will be collected, disbursed, and expended contrary to the provisions of the Constitution of this state relating to the appropriation and disbursement of public funds.

The title to this act (chapter 129, Sess. Laws 1925) is:

"An act creating a state real estate commission, providing for the appointment of commissioners, defining their powers and duties, fixing their compensation and term of office, providing for the creation of a general fund for said commission, providing for the issuance of licenses by said commission, and prohibiting any person, firm, copartnership, association or corporation to act as real estate broker or * * * salesman without first complying with the provisions of this act; assessing penalties for violation of this act, and for other purposes, repealing chapter 205, Session Laws of Oklahoma, 1923, and declaring an emergency."

Section 1 of the act (Acts 1923, c. 205) defines a real estate broker as:

"Any person, firm, partnership, copartnership, association or corporation, who for a compensation or valuable consideration sells or offers for sale, buys or offers to buy, or negotiates the purchase or sale or exchange of real estate, or who leases or offers to lease, or rents or offers for rent, any real estate or the improvements thereon for others, as a vocation."

It is further provided that a single transaction of the kind enumerated shall bring the agent within the purview of the law. This section contains a proviso excluding from its operation transactions of attorneys in fact or attorneys at law in the course of their profession as such, of receivers, trustees, guardians, administrators, and some others.

Section 2 authorizes the governor to appoint and create a real estate commission, composed of three members. This commission, when organized, is authorized to "do all things necessary and convenient for carrying into effect the provisions of this act and may from time to time promulgate necessary rules and regulations" to enforce it. Section 2 further provides for the maintenance of the offices of the commission and for its fiscal affairs, for offices in the state capitol building, for the employment of executive and clerical assistants, for the making, keeping, and distributing of public records and information, for collecting and dis-

bursing the moneys coming into the hands of the commission from licenses, fees, fines, penalties, or otherwise. (The question of whether the provisions of this section constitute an "appropriation," within the meaning of section 55, art. 5, of our Constitution, will be treated later in this opinion).

Section 3 provides that licenses shall be granted only to persons of good repute for honesty and fair dealing, and the section following provides how such qualifications and other requirements to be met shall be determined by the commission.

A part of section 6 provides as follows:

"The original fee for each real estate broker's license shall be $10, and the annual renewal fee shall be $5. The original fee for each real estate salesman's license shall be $2, and annual renewal fee shall be $2. Provided, that when a copartnership, association or corporation shall have paid an original fee of $10, or a renewal fee of $5, and shall have designated one of its members or officers as hereinafter provided in this section, the fees payable by any other member or officer actively engaged in the real estate business of such copartnership, association or corporation shall be $2 for the first registration fee and $2 for the renewal fee. * * *

"Every license shall expire on the thirty-first day of December of each year. The commission shall issue a new license for each ensuing year, in the absence of any reason or condition which might warrant the refusal of the granting of a license, upon receipt of the written request of the applicant and the annual fee therefor, as herein required. * * *

"Every real estate broker shall maintain a place of business in this state. If the real estate broker maintains more than one place of business within the state, a duplicate license shall be issued to such broker for each branch office maintained. Provided, that if such broker be a copartnership, association or corporation, a duplicate shall be issued to the members or officers thereof and a single fee

of $2 in each case shall be paid for each duplicate license. * * *"

Sections 7 and 8 provide that the commission may refuse to issue, or may revoke, any license for causes therein enumerated, after due notice and public hearing had, in which the commission is authorized to determine questions of both law and fact. The decision of the commission is final upon the matter, except that the person aggrieved may, in a proper court, apply for relief by certiorari, mandamus, or otherwise.

Section 11 provides a penalty for a violation of this act as follows:

"Any person or corporation violating the provisions of this act shall upon conviction thereof, if a person be punished by a fine of not less than $25, and not more than $500, or by imprisonment for a term not to exceed six months, or by both such fine and imprisonment, in the discretion of the court, and if a corporation be punished by a fine of not less than $100, nor more than $1,000. * * *"

The police power of the state in recent times has been extended to the regulation of an ever-increasing number of occupations and classes of business, including real estate and rental agents. Johnson v. Hulings, 103 Pa. 498, 49 Am. Rep. 131; Com. v. Real Estate Trust Co., 211 Pa. 51, 60 A. 551; Com. v. Samuel Black Co., 223 Pa. 74, 72 A. 261; 19 Cyc. 187; Little Rock v. Barton, 33 Ark. 436; Denning v. Yount, 62 Kan. 217, 71 P. 803, 50 L. R. A. 103; Buckley v. Humason, 50 Minn. 195, 52 N. W. 385, 16 L. R. A. 423, 36 Am. St. Rep. 637; St. Louis v. McCann, 157 Mo. 301, 57 S. W. 1016; Banta v. Chicago, 172 Ill. 204, 50 N. E. 233, 40 L. R. A. 611; Riley v. Chambers, 181 Cal. 589, 185 P. 855, 8 A. L. R. 419; Dent v. W. Virginia, 129 U. S. 114, 9 S. Ct. 231, 32 L. Ed. 623; Ex parte Whitley, 144 Cal. 167, 77 P. 879, 1 Ann. Cas. 13; Ex parte McManus, 151 Cal. 331, 90 P. 702; German Alliance Ins. Co. v. Lewis, 233 U. S. 389, 34 S. Ct. 612, 58 L. Ed. 1011, L. R. A. 1915C, 1189.

Where the evils incident to any particular occupation or business are manifestly grave and of common occurrence, and such evils may be corrected by appropriate public supervision, it is then within the power of the Legislature to adopt appropriate regulations. To this end the lawmaking power of the state may limit the free individual right of contract or conduct to promote the general welfare, provided the regulations proposed reasonably tend to correct the evils sought to be remedied without burdening the business or occupation or society at large with other evils more onerous.

The first pertinent inquiry presented is this: Is there such fraud, imposition, and unfair dealing practiced by real estate and rental agents amounting to a condition for public concern, as will justify public regulation; and do the regulations and requirements of this act reasonably tend to correct the evils sought to be remedied without inviting others equally baneful?

If the question of the necessity for such a law and the expediency of the remedy proposed were for us to determine in the first instance, we would not hesitate to hold that there was no justification for either. Where the regulation of business is not manifestly essential or necessary, the addition of boards, commissions, inspectors, and supervisors to our already top-heavy governmental machinery has a tendency to deprive the people of their inherent liberties, affecting every phase of society, to such an extent that the freedom of the individual to contract and to pursue ordinary callings without the interference of some governmental agency will soon cease to exist—a calamity more dire than occasional evils flowing from greater individual freedom of action.

But the existence of the mischief sought to be remedied and the potency of the remedy proposed are problems of political economy, to be determined primarily by the

Legislature. The Legislature, within its constitutional limitations, has the right to select governmental policies. Judicial review is limited to the authority and powers of the Legislature and their limitations. Insurance Co. v. Lewis, 233 U. S. 389, 34 S. Ct. 612, 58 L. Ed. 1011, L. R. A. 1915C, 1189; Hall v. Geiger-Jones Co., 242 U. S. 539, 37 S. Ct. 217, 61 L. Ed. 480, L. R. A. 1917F, 514, Ann. Cas. 1917C, 643; Lieberman v. Van De Carr, 199 U. S. 552, 26 S. Ct. 144, 50 L. Ed. 305.

The United States Supreme Court, in the case of Hall v. Geiger-Jones Co., supra, in upholding what is known as the Blue Sky Law, went to the extreme limit of holding that the police power of a state may be extended to protect individuals against their own cupidity or defective judgment. The federal and other appellate courts have also approved and upheld regulations governing the rental of houses and living quarters. Marcus Brown Holding Co. v. Feldman et al. (D. C.) 269 F. 307; Block v. Hirsh, 256 U. S. 135, 41 L. Ed. 458, 65 L. Ed. 865; Annotations, 16 A. L. R. 178.

Through the influence of the National Association of Real Estate Boards, beginning with the year 1919, twenty-two states, including Oklahoma, have enacted real estate license laws, patterned largely upon a model prepared by this association. The Oklahoma law contains many of the chief features of this model act, but differs from the others in two or three important features, to be noticed later. This general form of regulation has been upheld by appellate courts in the cases cited below. Ex parte Raleigh, 177 Cal. 746, 171 P. 950; Riley v. Chambers, 181 Cal. 589, 185 P. 855, 8 A. L. R. 419; Zerlin v. State, 158 La. 111, 103 So. 528; Bratton v. Chandler, 260 U. S. 110, 43 S. Ct. 43, 67 L. Ed. 157.

But, since the Legislature is primarily the judge of the necessity for this class of regulation, and since the appellate courts in several states have lately approved it and

the United States Supreme Court has also given its approval, we are constrained to hold that a reasonable plan for regulating real estate agents and their business by an official real estate commission or board, with executive and judicial powers to determine the qualifications of real estate brokers, and to prohibit those not qualified from acting as such, may be a subject of legislation within constitutional limitations.

To hold that the real estate business may be regulated, in this manner is not in conflict with the declarations of our Supreme Court in the opinion rendered in the case of State v. Riedell, 109 Okla. 35, 233 P. 684, holding that portions of the act regulating public accountants was unconstitutional and void because that act prohibited any accountant from pursuing that calling without a license showing his qualifications. The court in the Riedell Case pointed out that the occupation of an accountant in the performance of a private service was not inherently a matter of public concern, differing from trades and professions which touch all of the people generally. An accountant employed privately, if incompetent or dishonest, would affect only a limited class of individuals. Another distinction is that certain trades and professions are of such a nature that the value of the service rendered cannot be fully known by the recipient, and that a high degree of confidence in and reliance upon the knowledge and skill of the person performing the service must be had. This is not necessarily true of an accountant in the performance of a private service. He may be wanted to perform a service where no high degree of skill is required. The court in the Riedell Case was justified in holding that the prohibitions relating to the employment of public accountants privately removed the matter from the class of cases listed as doubtful and out of the twilight zone into a class beyond the power of the state to regulate.

That feature of the law providing that the Governor

shall appoint as real estate commissioners three persons from a list of fifteen names submitted by the Oklahoma Real Estate Association, and that not more than two shall be from the same political party, is probably in conflict with section 13, art. 6, of the Constitution of this state, in which an absolute power of appointment is lodged with the Governor. That power, it would seem, cannot be abridged by requiring him to select his appointees from those nominated by others. Rathbone v. Wirth, 150 N. Y. 459, 45 N. E. 15, 34 L. R. A. 408. This infirmity, however, would not of itself operate to make the other provisions of the act inoperative, if otherwise valid.

The act provides that the rejection of an application for a license, or the revocation of a license, shall be upon hearings had before the commission, upon written notice, at a time and place designated. The expense of procuring witnesses shall be borne by the person at whose request the witnesses are summoned. A license may be refused or revoked for misrepresentations, false promises, concealing the fact that the agent is acting for both buyer and seller, failure to account and remit, for being unworthy or incompetent, or for "any other conduct" constituting improper practice. This section (9) of the act of 1925 concludes as follows:

"The findings of fact made by the commission, acting within its powers, shall in the absence of fraud be conclusive, but the district court shall have the power to review questions of law and of fact involved in any final decision or determination of the commission; provided, that application is made by the aggrieved party within thirty days after such determination by certiorari, mandamus, or by any other method permissible under the rules and practice of said court, or the laws of this state, and said court may make such further orders in respect thereto as justice may require."

It is contended that these features pertaining to hearings and review are in conflict with the constitutional right

of equal protection of the law, of the guaranty that justice shall be administered without sale, denial, delay, or prejudice, and that no person shall be deprived of his property without due process of law.

The right to an appeal is statutory, and a denial of the right to judicial review is not in conflict with due process of law. It is a right which the Legislature may, in its discretion, grant, limit, or take away; and it may prescribe in what cases, under what circumstances and from what courts appeals may be taken. Unless the statute expressly or by plain implication provides for an appeal from a judgment of a court of inferior jurisdiction, none can be taken. 2 R. C. L. 27.

We cannot assume that these commissioners will act arbitrarily. If it should happen that they did, in lieu of an appeal, this law affords a remedy by mandamus or certiorari.

A statute requiring real estate brokers to furnish evidence of good moral character or reputation, and to secure a license, is a valid exercise of the police power of the state. Dent v. West Virginia, 129 U. S. 114, 9 S. Ct. 231, 32 L. Ed. 623; Ex parte Whitley, 144 Cal. 167, 77 P. 879, 1 Ann. Cas. 13; Ex parte McManus, 151 Cal. 331, 90 P. 702; German Alliance Ins. Co. v. Lewis, 233 U. S. 389, 34 S. Ct. 612, 58 L. Ed. 1011, L. R. A. 1915C, 1189; Riley v. Chambers, 181 Cal. 589, 185 P. 855, 8 A. L. R. 419.

In the Ohio Blue Sky Law it was provided that, as a condition to obtaining a license to sell securities, the dealer must establish his good repute to the satisfaction of a state official. This feature of the law was upheld. Hall v. Geiger-Jones Co., 242 U. S. 539, 37 S. Ct. 217, 61 L. Ed. 480, L. R. A. 1917F. 514, Ann. Cas. 1917C, 643.

The right to refuse or revoke teachers' certificates by superintendents and boards of education on account of bad

character or incompetency has never been challenged in this state. Sections 10549, 10565, Comp. Stat. 1921.

The next inquiry is: Are the provisions of this act relating to the fiscal affairs of the commission in conflict with our Constitution? The provisions for the collection and expenditure of funds are as follows:

"Each member of the commission shall receive as full compensation for each day actually spent on the work of said commission, the sum of $10.00 per day and his actual and necessary expenses incurred in the performance of duties pertaining to his office.

"The commission shall employ, and at its pleasure discharge, a secretary and such clerks and assistants as shall be deemed necessary to discharge the duties imposed by the provisions of this act, and shall outline their duties and fix their compensation, subject to the general laws of the state. The commission shall obtain such office space, furniture, stationery, fuel, light and other proper conveniences as shall be reasonably necessary for carrying out the provisions of this act; said offices to be situated in the state capitol building and the custodian of public buildings is hereby directed to set aside in the capitol building such space as may be required for the needs of the commission.
* * *

"All fees and charges collected by the commission under the provisions of this act shall be paid into the general fund of the Oklahoma real estate commission; said commission being hereby empowered and authorized to maintain and operate such general fund for the requirements and purposes of said commission under thhe provisions of this act including compensations to commissioners and employees, shall be paid out of the general fund in the Oklahoma real estate commission upon vouchers approved by a majority of the members of the commission; providing, that the total expense for every purpose incurred shall not exceed the total fees and charges collected and paid into the Oklahoma real estate commission under the provisions of this act." (Acts 1923, § 2).

Section 55, art. 5, of our Constitution provides:

"No money shall ever be paid out of the treasury of this state, nor any of its funds, nor any of the funds under its management, except in pursuance of an appropriation by law, nor unless such payments be made within two and one-half years after the passage of such appropriation act."

By reference to the provisions of the act it will be noted that it was the intention of the Legislature to empower the commission within itself to act as its general manager, collector, auditor, treasurer, and paymaster. The commission is given authority to collect and spend as much money as it can get, under the provisions of the act, without accounting or reporting to any other person or department of the state. The language of the act, stating that the commission is "empowered and authorized to maintain and operate such general fund for the requirements and purposes of said commission" is susceptible of no other construction.

Ours is a republican form of government, safeguarded by checks and balances. It is contrary to the genius of our institutions to permit one and the same person to collect and spend the people's money. From the provisions of the section of the Constitution above quoted, it is apparent that the sovereign people who framed the Constitution intended to keep a firm hand on the public purse strings, by limiting the power to spend money without an appropriation. If the Legislature is permitted to authorize a department of state to collect an indefinite amount of revenue from fees, fines, and penalties and spend all or a portion of it at will, it in effect destroys section 55, art. 5, of the Constitution, providing that public funds must not be paid out except in pursuance of an appropriation previously made.

Better to comprehend the nature and purpose of an appropriation, a glance at the history of the origin and developments of appropriations is illuminating. Originally the king collected and disbursed the moneys of the realm at will. In the year 1215 the barons forced King John to

relinquish control of the exchequer, at Runnymede. In the course of time that power was taken from the lords and barons and lodged with the House of Commons. In this country, when the union of the states came into being, the manner of collecting and disbursing public funds was further limited by a proviso in the federal Constitution that all revenue measures should originate in the House of Representatives, and that:

"No money shall be drawn from the treasury, but in consequence of appropriations made by law; and a regular statement and account of the receipts and expenditures of all public money shall be published from time to time." (Art. 1, §9).

When the federal Constitution was being framed, this feature of the instrument was under consideration on a number of different days, as appears from the journal of the convention. In the course of these debates, Benjamin Franklin, the original watchdog of the treasury, said: "It is always important for the people to know who has disposal of their money, and how it can be disposed of." Another delegate expressed the same principle by declaring: "The people should hold the purse strings." That the people then were and still are jealous of this safeguard is evidenced by like provisions found in the Constitutions of all of the several states.

Now what is an appropriation within the meaning of section 55, art. 5, of our Constitution? Our Supreme Court, in an able opinion written by Justice R. L. Williams (Menefee v. Askew, Game Warden, 25 Okla. 623, 107 P. 159, 27 L. R. A. [N. S.] 527), defines it thus:

"An 'appropriation' in this state is an authority of the Legislature, given at the proper time and in legal form to the proper officers, to apply a distinctly specified sum, from a designated fund out of the treasury in a given year, for a specified object or demand against the state."

Other judicial definitions, equivalent in meaning, are

numerous. Black's Law Dict. (2d Ed.) 80; Words and Phrases, Second Series, p. 257; 4 Corpus Juris, 1460.

In this act the amount of money to be paid to the commissioners as salary is not fixed in any definite amount, and according to the terms of the act there is no way in which their compensation can be definitely computed. The same is true of clerk hire and other expenses. Quoting further from the Menefee Case, supra:

"A valid appropriation under the provisions of our Constitution must distinctly specify the sum and the object to which it is to be applied. The object is distinctly specified, but the sum appropriated for actual and necessary office expenses is not set out or distinctly specified in any of the provisions of the act called to our attention, and in that respect the act falls. Under the provisions of this act, it seems that for such sum or sums as may be expended by the game and fish commissioner for actual and necessary office expenses a debt against such fund is created, but can be realized on by an appropriation only, specifically designating the sum, as well as the object or purpose for which the appropriation is made."

The case of Edwards v. Childers, State Auditor, 102 Okla. 158, 228 P. 472, was a case wherein the plaintiff sought to enjoin the state auditor and state treasurer from approving or disbursing the funds from the state highway and construction fund in the state treasury, on the ground that there was no legal appropriation authorizing such disbursement. The court held that the appropriation was sufficient, and denied the application for an injunction. The Edwards Case differs from the case here under consideration in several material particulars. In the Edwards Case the authority for the disbursement of funds was in this language:

"All moneys raised by taxation or otherwise for the use of state highways of this state shall, unless otherwise provided by law, be placed in the state treasury in a fund, to be known as the state highway construction and maintenance fund, and shall be expended on state or county high-

ways as herein provided, upon warrants issued by the state auditor after the filing of proper voucher or claims, by the state highway commission."

In the case here being considered there was no special fund created. There was a fund named, but the naming of a fund and the creating of one are two different things. Moreover, the proponents of this act did not contemplate that the real estate commission fund would ever reach the state treasurer. It did not in its title, or elsewhere, assume to repeal or modify any general law, or provide that the funds collected should be handled or disbursed in accordance with any other existing law. On the contrary, by the express provisions of the act, none of the funds were to reach the state treasury, or any other independent depository. The commission was empowered to collect and spend all the moneys collected without permission or hindrance from the treasurer, auditor, or any other state official. The act plainly states this and is susceptible of no other construction.

It may be conceded, as was stated in the case of Edwards v. Childers, supra, that an appropriation may be authorized by implication. The court did not, as we construe it, attempt to announce a new or modified definition as to what constitutes an appropriation of a special fund not derived from the general revenues of the state. The collection, appropriation and disbursement of funds are three distinct instrumentalities. The derivation of a fund has nothing to do with its appropriation.

Bearing these distinctions in mind, we conclude that the legislative authority given to the real estate commission to collect and assemble funds in uncertain and unascertainable amounts and to pay out and distribute the same to themselves and their employes, and for sundry other indefinite expenses, without supervision, is not an appropriation within the meaning of section 55, art. 5, of the Constitution.

To say that an appropriation is made when a commission is authorized to spend a whole fund as it pleases for a particular purpose, but that no appropriation is intended where the expenditures are limited to specified items or amounts, is a test which will necessarily defeat the very purpose of the constitutional prohibition against improvidence and waste by public officials. In nearly all of the cases cited in Edwards v. Childers there was a formal appropriation from a special or general fund in a definite sum, or in a sum which could be definitely ascertained, not contingent upon uncertain revenue, or for indefinite purposes—cases which shed but little light upon the question of whether statutes of this character will operate as an appropriation.

The more rational definition, and the one supported by the greater weight of authority, of the constitutional meaning of a public appropriation is the one quoted from Justice Williams' opinion in Menefee v. Askew, supra. Most of the authorities cited in Edwards v. Childers support Justice Williams' definition, rather than the one announced in that opinion. Courts should not indulge in subtle distinctions to avoid constitutional limitations.

So far as we know the commissioners in this particular instance have collected and disbursed their funds honestly and discreetly. They may be like Caesar's wife, above suspicion, but such fact will not constitute a sufficient reason for disregarding a provision of our Constitution. Other commissioners may follow who are not so circumspect. If it is necessary to give boards and commissions more latitude in the expenditure of money, we should first change the Constitution.

There is yet another incongruity in this act. By general law the state board of public affairs is the custodian and superintendent of the capitol building and its offices. The board of affairs is the fiscal agent of the state to pur-

chase office furniture and supplies for all departments of the state. Without attempting to modify the board of affairs law, the real estate commission is empowered by this act to purchase or obtain its office equipment, furniture and supplies. Just why the board of affairs should manage the office affairs of every department of state except this is not apparent.

We hold, therefore, first, that the Real Estate Commission Act (chapter 129, Session Laws of Oklahoma 1925) created no special fund subject to public supervision, or otherwise; second, that no valid appropriation of funds was made, within the meaning of section 55, art. 5, of the Constitution; and, third, that it is against public policy to operate a department of state not supported by public funds, pursuant to a valid appropriation; and that for these reasons the whole act is inoperative and void.

The writ of habeas corpus is granted, and the petitioner discharged.

DOYLE and EDWARDS, JJ., concur.