HALL, SUPERINTENDENT OF BANKS AND BANKING OF THE STATE OF OHIO *v.* GEIGER–JONES COMPANY.[1]

HALL, SUPERINTENDENT OF BANKS AND BANKING OF THE STATE OF OHIO *v.* COUL-TRAP.

HALL, SUPERINTENDENT OF BANKS AND BANKING OF THE STATE OF OHIO ET AL. *v.* ROSE ET AL.

APPEALS FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF OHIO.

Nos. 438, 439, 440. Argued October 16, 17, 1916.—Decided January 22, 1917.

The Ohio "Blue Sky Law," Supplement to Page & Adams' Ann. Gen. Code of Ohio, 1916, vol. 2, §§ 6373–1 to 6373–24, examined as to its constitutionality and upheld.

In the exercise of the power to prevent fraud and imposition, *Hutchinson Ice Cream Co.* v. *Iowa, ante,* 153, a State may forbid dealing in stocks and other securities within its borders without a license, and subject the business to executive supervision.

The liability of a business to regulation is not necessarily dependent upon its liability to be abolished under the police power.

Under the so-called "Blue Sky Law" of Ohio, dealers within its provisions (including companies floating their own issues) are not licensed to sell stocks and other securities unless an executive officer designated is satisfied of the good business repute of the applicants and their agents, and licenses, when issued, may be revoked by him upon ascertaining that the licensees are of bad business repute, have violated any provision of the act, or have engaged, or are about to engage, under favor of their licenses, in illegitimate business or fraudu-

---

[1] These cases, together with *Caldwell et al.* v. *Sioux Falls Stock Yards Co. et al., post,* 559, involving the "Blue Sky Law" of South Dakota, and *Merrick et al.* v. *Halsey & Co. et al., post,* 568, involving the "Blue Sky Law" of Michigan, have been styled for convenience "The Blue Sky Cases."

lent transactions; his findings, however, are made subject to judicial review. *Held,* that the powers thus conferred are not arbitrary but consistent with due process under the Fourteenth Amendment. *Gundling* v. *Chicago,* 177 U. S. 183.

The fact that the statute designates a particular court to review the executive findings does not affect its validity.

It is to be presumed that the executive officer will act properly in the public interest, and not wantonly or arbitrarily.

Whether there is a constitutional liberty to buy securities on one's own judgment of value without governmental interposition to protect from bad bargains—will not be determined at the suit of parties whose rights are involved only from the standpoint of sellers; but

*Quære:* Whether the state power does not extend to such guardianship over buyers.

The equal protection clause of the Fourteenth Amendment leaves the States at liberty to regulate those activities which they deem conspicuous sources of existing evils, without embracing others which, but for this distinction, would fall in the same class.

A state law designed to prevent fraud in the selling of securities, which affects securities coming from other States only in requiring that persons dealing in them within the State shall be first licensed, shall file information concerning them and be subject in such dealing to executive supervision, is not invalid as a direct burden on interstate commerce.

*Quære:* As to when and under what circumstances securities transported into a State may be held to have lost their interstate character?

230 Fed. Rep. 233, reversed.

THESE cases were heard together in the District Court and there disposed of in one opinion. They were argued and submitted together here. The bills of complaint attacked from different angles the so-called Blue Sky Law of the State of Ohio, which provides:

"Sec. 6373–1. Except as otherwise provided in this act, no dealer shall, within this state, dispose or offer to dispose of any stock, stock certificates, bonds, debentures, collateral trust certificates or other similar instruments (all hereinafter termed 'securities') evidencing title to or interest in property, issued or executed by any private or quasi-public corporation, co-partnership or association

(except corporations not for profit,) or by any taxing subdivision of any other state, territory, province or foreign government, without first being licensed so to do as hereinafter provided. . . .

"Sec. 6373–2. . . . The term 'dealer,' as used in this act, shall be deemed to include any person or company, except national banks, disposing, or offering to dispose, of any such security, through agents or otherwise, and any company engaged in the marketing or flotation of its own securities either directly or through agents or underwriters or any stock promotion scheme whatsoever, except:

"(a) An owner, not the issuer of the security, who disposes of his own property, for his own account; when such disposal is not made in the course of repeated and successive transactions of a similar character by such owner; or a natural person, other than the underwriter of the security, who is a *bona fide* owner of the security and disposes of his own property for his own account;

\*    \*    \*    \*    \*    \*    \*    \*

"As used in this act, the term 'company' shall include any corporation, co-partnership or association, incorporated or unincorporated, and whenever and wherever organized; . . ."

The Geiger-Jones Company is an Ohio corporation, licensed to do the business of buying and selling investment securities and of buying and selling the stocks and bonds of industrial corporations. It has a regularly established clientage, it alleges, of about 11,000 persons residing in the State of Ohio and other States and has sold and there are now outstanding in the hands of persons to whom it has sold securities of about twenty to twenty-five million dollars, par value, and has stockholders in Ohio and other States. That the securities above referred to consist of securities of over twenty corporations of Ohio and other States and foreign countries. That it is still selling such

securities and is and has been engaged in intrastate, interstate and foreign commerce.

The appellee, Don C. Coultrap, in No. 439 repeats the allegations made by Geiger-Jones Company, with enumeration of some of the companies in whose stocks and securities that corporation is engaged in dealing, and alleges that he is the owner and holder of its stocks and of the stocks of other companies and is engaged in buying and selling and offering to sell such stocks in the State of Ohio and in the State of Pennsylvania, and in the course of such transactions travels back and forth between those States and conducts a correspondence from Pennsylvania to Ohio and receives certificates evidencing the ownership of stock from the State of Ohio and sends them from Pennsylvania to Ohio.

William R. Rose, one of the appellees in No. 440, alleges himself to be a citizen of Ohio and engaged in that State in the business of buying and selling investment securities and particularly the stocks and bonds of industrial corporations and that he has built up and maintained a large and profitable business and an enviable reputation.

The RiChard Auto Manufacturing Company, the other appellee, is a corporation of West Virginia but has its principal place of business in Cleveland, Ohio, and has a contract to manufacture and is ready to manufacture automobiles under certain patents obtained by Francois RiChard as soon as and not until the stock of the company can be put upon the market and a sufficient amount realized therefrom for such purposes.

That on September 25, 1914, and prior thereto, Rose was actively engaged in buying and selling stocks and bonds of industrial corporations and investment securities in general, and particularly the stock of the RiChard Auto Manufacturing Company, of which company he was the secretary, and for which business he had unusual aptitude and was able to prosecute more successfully "than any

other man whose services were available to said corporation."

That on September 25th he was arrested upon an affidavit filed by one H. R. Young, a subordinate and deputy of the state superintendent of banks and banking for the State of Ohio, under whose immediate direction and control he was then acting. Rose, upon being taken before a magistrate, waived examination and was "bound over to the grand jury" of Cuyahoga County, which jury subsequently returned an indictment against him for violation of the law.

The grievance alleged in Nos. 438 and 439 is that under the laws of the State the Attorney General is threatening to give an opinion to Hall, the superintendent of banks and banking, that the law is valid and that it is the duty of Hall to cancel appellees' license and that this will result in irreparable injury to appellees and to their security holders from the publicity they will obtain. And it is apprehended that Hall will act on such advice, believing that he is bound by the opinion of the Attorney General.

The statute is attached to the bills and is asserted to be unconstitutional, invalid and void and the particulars are enumerated to be that it will deprive appellees of their property without due process of law, deny them the equal protection of the laws, impose burdens on interstate commerce, confer executive powers, delegate such powers and legislative powers in violation of the constitution of Ohio. Appellees consider themselves remediless except in equity and pray injunctions interlocutory and permanent.

The complaint of Rose and the Auto Company is that Hall, superintendent of banks and banking, is actively engaged in the prosecution of the proceedings against Rose and has, together with the prosecuting attorney, interfered with, interrupted and completely prevented Rose from carrying on his business in the State of Ohio and especially in attempting upon his part to dispose of and

sell the stock of the Auto Company, and that the prose-
cuting attorney and the sheriff of Cuyahoga County, un-
less restrained, will assist and actively coöperate with
Hall, to the great and irreparable injury of both Rose and
the Auto Company.

The charge is amplified by details which it is unneces-
sary to give and the law is charged to be unconstitutional
in the same particulars as those .enumerated by the
Geiger-Jones Company.

Injunctions temporary and perpetual are prayed.

The District Court in the Geiger-Jones case considered.
that it was without power to enjoin the Attorney General
but decided that it could and should under the charges of
the bill restrain Hall from further action under the law,
the restraint to continue until the hearing and determina-
tion of the applications of the respective complainants for
interlocutory injunctions.

The applications subsequently came to be heard before
three judges, and Hall and all of his employees and subor-
dinates were enjoined from attempting to enforce the
provisions of the law. . There was an exception in No. 440
as follows: "  .  .  .   except such proceedings as may
be deemed proper in any criminal action pending against
said complainants or either of them when the complaint
in this cause was filed." The injunctions in all the cases
were to continue until final decision or further order of the
court. The court declared the law to be obnoxious to all
of the charges made by the respective complainants
against it. 230 Fed. Rep. 233.

*Mr. Edward C. Turner*, Attorney General of the State
of Ohio, for appellants.

*Mr. John A. Shauck* and *Mr. Timothy S. Hogan*, with
whom *Mr. A. M. McCarty, Mr. E. N. Huggins, Mr. M. B.
Johnson, Mr. H. H. Johnson* and *Mr. Francis R. Marvin*
were on the briefs, for appellees:

Cases of the type of *German Alliance Insurance Co.* v. *Lewis*, 233 U. S. 389, involving insurance and other kinds of business upon which the public is peculiarly dependent and which are not made up of ordinary commercial transactions, and cases like *Rast* v. *Van Deman & Lewis Co.*, 240 U. S. 342, involving methods of business which by their very nature are harmful, have no application to a law like this which assumes to regulate and forbid the normal contracts of commerce.

The act is clearly void (1) because it permits the commissioner arbitrarily, by granting or refusing licenses, to tolerate or destroy the right to carry on an ordinary calling and to exercise a guaranteed right of contract, (2) because it authorizes him to place forbidden restrictions and burdens on the conduct of business after a license has been obtained, and (3) because of the provisions which invest him with arbitrary power to revoke licenses.

Another vice which pervades the entire act is the requirement that before obtaining a license an applicant shall consent to be sued in a particular county and file an irrevocable authority with a state officer to accept service of process. This denies the equal protection of the state laws which, as to other defendants, make a different and more favorable provision as to both venue and service.

There is no attempt to exercise legislative power in prescribing the qualifications of the person who may be entitled to receive a license to exercise dominion over his own property or to engage in interstate commerce. Both standards of qualification in a licensee and compliance with them are left to the exclusive and arbitrary will of the commissioner. Whether the act is condemned as a forbidden attempt to delegate legislative power, as has been done in some cases, or as an attempt to confer arbitrary power, as in others, it is in this respect violative of all the guarantees which we invoke.

The applicant for a license has no right to a hearing upon his application, nor has the holder of a license a right to be heard upon notice looking to its revocation.

The applicant must submit to the commissioner the particulars of his business and business agencies. The commissioner may make such further investigation as he may deem necessary concerning good repute, and then, if he be satisfied in that regard and the fees and expenses demanded are paid, the applicant may have a license to deal in the securities, and not otherwise. Less flagrant legislation has been condemned in numerous. cases, among which are *Harmon v. State*, 66 Ohio St. 249; *City of Richmond v. Dudley*, 129 Indiana, 112; *Bills v. City of Goshen*, 117 Indiana, 221; *Mayor v. Radecke*, 49 Maryland, 217; *State v. Tenent*, 110 N. Car. 609; *Gambad v. Deering*, 84 Wisconsin, 585; *Cicero Lumber Co. v. Town of Cicero*, 176 Illinois, 9; *Noel v. People*, 187 Illinois, 587; *Yick Wo v. Hopkins*, 118 U. S. 356; *Butchers' Union Co. v. Crescent City Co.*, 111 U. S. 746; *Allgeyer v. Louisiana*, 165 U. S. 578; *Moskowitz v. Jenkins*, 202 N. Y. 53.

The proclaimed virtue of the act is its vice. While in form it conditions and, under circumstances which are likely to arise, it prohibits sales, at the same time it necessarily prevents purchases, and thereby shields contemplating purchasers from the exercise of their own defective judgments. For it is to be borne in mind that the terms of the act operate upon honest sales as well as those which are fraudulent. In all transactions within its purview it places the citizens of the State under guardianship and deprives them of dominion over their property which is an essential element of its ownership. See *Smith v. Burlingame*, 4 Mason, 121.

The act is also objectionable for the very numerous discriminations which deny the equal protection of the laws under the Fourteenth Amendment.

The prevention of fraud is within the power of the legis-

lature without interfering with the freedom of normal commerce.

Bearing in mind the principles announced in *Hannibal & St. Joseph R. R. Co.* v. *Husen,* 95 U. S. 465, and in *Welton* v. *Missouri,* 91 U. S. 275, it is plain that the act contravenes the commerce clause. *International Textbook Co.* v. *Pigg,* 217 U. S. 91; *Buck Stove & Range Co.* v. *Vickers,* 226 U. S. 205, 213–216; *Lottery Case,* 188 U. S. 321; *Butler Bros. Shoe Co.* v. *U. S. Rubber Co.,* 156 Fed. Rep. 1.

*Nathan* v. *Louisiana,* 8 How. 73, and *Paul* v. *Virginia,* 8 Wall. 168, are not opposed to this contention.

Transportation is by no means the only element of commerce. *Lyng* v. *Michigan,* 135 U. S. 161; Story on the Constitution, § 1072. Commerce is intercourse and traffic. When an order comes from another State to a dealer in Ohio for stocks and bonds, the sale occurs at his place of business, and this sale is one of the ingredients of the transaction, which is interstate commerce. The act regulates and conditions the right to effect such sale. Thus it appears that the very first element of interstate commerce is prohibited unless permitted by the State. Also, if the dealer is prohibited from selling, the result is to prohibit him from importing securities for sale. The act, therefore, forbids all traffic in articles of interstate commerce so long as sales are to be effected in Ohio. *Buck Stove & Range Co.* v. *Vickers, supra.*

The business being predominantly private and therefore not subject to the police power of the State in any instance, the latter cannot afford a justification for this interference with interstate commerce. *Adams Express Co.* v. *New York,* 232 U. S. 314; *Haskell* v. *Cowham,* 109 C. C. A. 235; *Kansas City Southern Ry. Co.* v. *Kaw Valley Drainage District,* 233 U. S. 75.

The amendment of the constitution of Ohio is without effect in this case.

*Mr. George Cosson*, Attorney General of the State of Iowa, and *Mr. Walter C. Owen*, Attorney General of the State of Wisconsin, by leave of court, filed a brief as *amici curiæ* on behalf of the National Association of Attorneys General of the United States.

*Mr. George W. Wickersham*, *Mr. Robert R. Reed* and *Mr. Charles K. Allen*, by leave of court, filed a brief as *amici curiæ* on behalf of the Investment Bankers Association of America.

MR. JUSTICE MCKENNA, after stating the case as above, delivered the opinion of the court.

It will be observed that these cases bring here for judgment an asserted conflict between national power and state power, and bring, besides, power of the State as limited or forbidden by the National Constitution.

The assertion of such conflict and limitation is an ever-recurring one; and yet it is approached as if it were a new thing under the sun. The primary postulate of the State is that the law under review is an exercise of the police power of the State, and that power, we have said, is the least limitable of the exercises of government. *Sligh* v. *Kirkwood*, 237 U. S. 52. We get no accurate idea of its limitations by opposing to it the declarations of the Fourteenth Amendment that no person shall be deprived of his life, liberty or property without due process of law or denied the equal protection of the laws. *Noble State Bank* v. *Haskell*, 219 U. S. 104, 110. A stricter inquiry is necessary, and we must consider what it is of life, liberty and property that the Constitution protects.

What life is and what may or may not affect it, we have quite accurate tests; and what liberty is in its outside sense, and, in like sense, what property is. We know that it is of the essence of liberty—indeed, we may say, of life—that there shall be freedom of conduct, and yet there may

be limitations upon such freedom. We know that in the concept of property there are the rights of its acquisition, disposition and enjoyment—in a word, dominion over it. Yet all of these rights may be regulated. Such are the declarations of the cases, become platitudes by frequent repetition and many instances of application.

The question then is, Is the statute of Ohio within the principles declared? The statute is a restraint upon the disposition of certain property, and requires dealers in securities evidencing title to or interest in such property to obtain a license—a requirement simple enough in itself and yet of itself asserted to be an illegal control of a private business, made especially so by the conditions which are imposed. These conditions, summarized, are as follows:

To obtain the license there must be filed with the superintendent of banks and banking (termed in the act "commissioner") application for such license, together with information in such form as the commissioner shall determine, setting forth:

"(a) The names and addresses of the directors and officers if such applicant be a corporation or association and of all partners if it be a partnership, and of the person if the applicant be an individual, together with names and addresses of all agents of such applicant assisting in the disposal of such securities;

"(b) Location of the applicant's principal office and of his principal office in the state, if any;

"(c) The general plan and character of the business of said applicant, together with references which the 'commissioner' shall confirm by such investigation as he may deem necessary, establishing the good repute in business of such applicant, directors, officers, partners and agents.

"If the applicant be a corporation organized under the laws of any other state, territory or government, or have its principal place of business therein, it shall also file a copy of its articles of incorporation, certified by the proper

officer of such state, territory or government, and of its regulations and by-laws; and if it be an unincorporated association, a certified copy of its articles of association, or deed of settlement."

The applicant is also required to file a written instrument irrevocably consenting to be sued in a particular county and, if personal service there cannot be had, consenting to service upon the sheriff of the county.

It is also provided that all of the applications shall be published in a daily newspaper and if the commissioner be satisfied that the applicant is of good business repute, he shall, upon payment of certain fees, register the applicant as a licensed dealer in securities. Pending disposition of the application temporary permission to transact business may be given. Yearly renewals of the licenses are provided for.

The commissioner may revoke a license upon ascertaining that the licensee: (a) is of bad business repute; (b) has violated any provision of the act; or (c) has engaged, or is about to engage, under favor of such license, in illegitimate business or fraudulent transactions.

It will be observed, therefore, that the law is a regulation of business, constrains conduct only to that end, the purpose being to protect the public against the imposition of unsubstantial schemes and the securities based upon them. Whatever prohibition there is, is a means to the same purpose, made necessary, it may be supposed, by the persistence of evil and its insidious forms and the experience of the inadequacy of penalties or other repressive measures. The name that is given to the law indicates the evil at which it is aimed, that is, to use the language of a cited case, "speculative schemes which have no more basis than so many feet of 'blue sky'"; or, as stated by counsel in another case, "to stop the sale of stock in fly-by-night concerns, visionary oil wells, distant gold mines and other like fraudulent exploitations." Even if the descriptions be regarded as rhetorical, the existence of evil is

indicated, and a belief of its detriment; and we shall not pause to do more than state that the prevention of deception is within the competency of government and that the appreciation of the consequences of it is not open for our review. *The Trading Stamp Cases*, 240 U. S. 342, 391. Therefore, the purpose being legal, the question only remains whether the manner in which it is accomplished is illegal. This is contended, and the provisions which render the law void are found, it is stated, in: (1) Power conferred upon the commissioner to grant or refuse licenses; (2) the authority given the commissioner to place forbidden restrictions and burdens on the conduct of the business of one who has obtained a license.

The basis of these contentions is that the law confers arbitrary power upon the commissioner. In considering the contentions we must keep in mind that the law is addressed to a complex situation. Its purpose is, as we have seen, to give a basis for judgment of the securities offered the purchasing public; assure credit where it is deserved and confidence to investment and trading; prevent deception and save credulity and ignorance from imposition, as far as this can be done by the approved reputation of the seller of the securities and authoritative information.

It may, however, be said that character establishes itself and neither needs nor can be compelled to accept the stamp of government, and it is asserted that the "normal investment business of the country" and its "individual transactions" are not subject to "executive control," the broad contention being made that as such business cannot be prohibited it cannot be regulated. This, indeed, is the basic principle of the opposition to the statute. It is expressed in many ways, and the various provisions of the statute—those that are explicit in direction to the commissioner and those that commit discretion to him—are said to so burden and complicate "normal business as to

make it difficult if not impossible to carry it on in a normal way, if at all."

As broadly made, we cannot assent to these propositions. The reason and extent of the law we have indicated and the control to which individual transactions are subjected, and we think both are within the competency of the State. It is to be remembered that the value of securities consists in what they represent, and to determine such value is a complex problem even to the most skillful and informed.

We have very lately decided a case upon the principle of the power of the State to prevent frauds and impositions. *Hutchinson Ice Cream Co.* v. *Iowa, ante,* p. 153. The principle applies as well to securities as to material products, the provisions of the law necessarily varying with the objects. As to material products the purpose may be accomplished by a requirement of inherent purity. The intangibility of securities, they being representatives or purporting to be representatives of something else, of property, it may be, in distant states and countries, schemes of plausible pretensions, requires a difference of provision and the integrity of the securities can only be assured by the probity of the dealers in them and the information which may be given of them. This assurance the State has deemed necessary for its welfare to require; and the requirement is not unreasonable or inappropriate. It extends to the general market something of the safeguards that are given to trading upon the exchanges and stock boards of the country, safeguards that experience has adopted as advantageous. Inconvenience may be caused and supervision and surveillance, but this must yield to the public welfare; and against counsel's alarm of consequences, we set the judgment of the State.

We turn back, therefore, to consider the more specific objections to the law. The basis of them is, as we have seen, the power conferred upon the commissioner, which is

asserted to be arbitrary. The objection is somewhat difficult to handle. It centers in the provision that requires the commissioner, as a condition of a license, to "be satisfied of the good repute in business of such applicant and named agents," and in the power given him to revoke the license or refuse to renew it upon ascertaining that the licensee "is of bad business repute; has violated any provision of this act or has engaged, or is about to engage, under favor of such license, in illegitimate business or in fraudulent transactions." It is especially objected that as to these requirements no standard is given to guide or determine the decision of the commissioner. Therefore, it is contended that the discretion thus vested in the commissioner leaves "room for the play and action of purely personal and arbitrary power."

We are a little surprised that it should be implied that there is anything recondite in a business reputation or its existence as a fact which should require much investigation. If in special cases there may be controversy, those cases the statute takes care of; an adverse judgment by the commissioner is reviewable by the courts. Section 6373–8. So also as to the other judgments.

Besides it is certainly apparent that if the conditions are within the power of the State to impose, they can only be ascertained by an executive officer. Reputation and character are quite tangible attributes, but there can be no legislative definition of them that can automatically attach to or identify individuals possessing them, and necessarily the aid of some executive agency must be invoked. The contention of appellees would take from government one of its most essential instrumentalities, of which the various national and state commissions are instances. But the contention may be answered by authority. In *Gundling v. Chicago,* 177 U. S. 183, an ordinance of the City of Chicago was passed on which required a license of dealers in cigarettes and as a condition

of the license that the applicant, if a single individual, all of the members of the firm, if a co-partnership, and any person or persons in charge of the business, if a corporation, should be of good character and reputation, and the duty was delegated to the mayor of the city to determine the existence of the conditions. The ordinance was sustained. To this case may be added *Red "C" Oil Manufacturing Co.* v. *North Carolina*, 222 U. S. 380, 394, and cases cited; *Mutual Film Corporation* v. *Industrial Commission of Ohio*, 236 U. S. 230; *Brazee* v. *Michigan*, 241 U. S. 340, 341. See also *Reetz* v. *Michigan*, 188 U. S. 505; *Lieberman* v. *Van De Carr*, 199 U. S. 552.

The discretion of the commissioner is qualified by his duty, and besides, as we have seen, the statute gives judicial review of his action. Pending such review we must accord to the commissioner a proper sense of duty and the presumption that the functions entrusted to him will be executed in the public interest, not wantonly or arbitrarily to deny a license to or take one away from a reputable dealer (*Plymouth Coal Co.* v. *Pennsylvania*, 232 U. S. 531, 545); and, as we have said, in cases where there can be a dispute of fact, the statute provides for judicial review, and we see no legal objection to the designation of a particular court for such review.

We are not disposed to give serious attention to the contention that while the statute in form prohibits sales "it at the same time necessarily prevents purchases, and thereby shields contemplating purchasers from loss of property by the exercise of their own defective judgment," and puts them as well as the sellers under guardianship. If we may suppose that such purchasers would assert a liberty to form a "defective judgment" and resent means of information as a limitation of their freedom, we must wait until they themselves appear to do so. Besides, there are examples in legislation of unsolicited protection, and there is much in the business we are con-

sidering which urges to an imitation of the examples. It is not wise to put out of view the tendencies of the business and that it tempts to and facilitates speculative judgments, if the purpose be trading, improvident judgments, if the purpose be investment. Whatever detriment may come from such judgments the law may be powerless to prevent; but against counterfeits of value the law can give protection, and such is the purpose of the statute under review. It must be judged of upon that consideration, not upon the assertion of an absolute liberty of conduct which does not exist.

Discriminations are asserted against the statute which extend, it is contended, to denying appellees the equal protection of the laws. Counsel enumerates them as follows:

"Prominent among such discriminations are between the cases where more or less than fifty per cent. of an issue of bonds is included in the sale to one person; between securities which have and which have not been authorized by the public service commission of this state; between the securities issued by a bank, trust company, a building and loan association organized under the laws of this state and those which are not; between an *owner* who sells his securities in a single transaction and one who disposes of them in successive transactions; between a bank or trust company who sells at a commission of not more than two per cent. and one which sells at a higher commission; against securities when any part of the proceeds to be derived from the sale are to be applied in payment for patents, services, good will or for property not located in this state; in providing for such delays in the issuance of a license and in the subsequent conduct of business thereunder as to substantially hinder, and in many cases naturally arising, to utterly prevent sales; in discriminating between securities which have and which have not been published in regular market reports; be-

tween sales where in a single transaction the sale is for
five thousand dollars or more; in discriminations against
securities issued by taxing subdivisions of other states;
between securities upon which there has and has not been
a default as to principal or interest; against securities
which have not from time to time for six months been
published in the regular market reports or the news
columns of a daily newspaper of general circulation in the
state; where the securities are or are not of manufacturing
or transportation companies in the hands of *bona fide* pur-
chasers prior to March 1st, 1914, where such companies
were, on that date and shall be at the time of the proposed
sale, going concerns; between cases where the information
contemplated is or is not contained in a standard manual
of information approved by the commissioner; where the
disposal is or is not made for a commission of less than one
per cent. of the par value thereof by a licensee who is a
member of a regularly organized and recognized stock
exchange and who has an established and lawfully con-
ducted business in this state regularly open for public
patronage as such; between cases in which the vendor
proposes to sell securities for which he has and those for
which he has not paid ninety per cent. of the price at
which they are to be sold by him; where the securities are
or are not those of a common carrier or of a company
organized under the laws of this state and engaged prin-
cipally in the business of manufacturing, transportation,
etc., and the whole or a part of the property upon which
such securities are predicated are located within this
state."

We cannot give separate attention to the asserted dis-
criminations. It is enough to say that they are within the
power of classification which a State has. A State "may
direct its law against what it deems the evil as it actually
exists without covering the whole field of possible abuses,
and it may do so none the less that the forbidden act does

not differ in kind from those that are allowed. . . .
If a class is deemed to present a conspicuous example of
what the legislature seeks to prevent, the Fourteenth
Amendment allows it to be dealt with although otherwise
and merely logically not distinguishable from others not
embraced in the law." *Central Lumber Co.* v. *South
Dakota,* 226 U. S. 157, 160. The cases were cited from
which those propositions were deduced. To the same
effect is *Armour & Company* v. *North Dakota,* 240 U. S.
510, 517.

The next contention of appellees is that the law under
review is a burden on interstate commerce, and therefore
contravenes the commerce clause of the Constitution of
the United States. There is no doubt of the supremacy of
the national power over interstate commerce. Its in-
action, it is true, may imply prohibition of state legislation
but it may imply permission of such legislation. In other
words, the burden of the legislation, if it be a burden, may
be indirect and valid in the absence of the assertion of the
national power. So much is a truism; there can only be
controversy about its application. The language of the
statute is: "Except as otherwise provided in this act, no
dealer shall, *within this state,* dispose" of certain securities
"issued or executed by any private or quasi-public corpo-
ration, co-partnership or association (except corporations
not for profit) . . . without first being licensed so to
do as hereinafter provided."

The provisions of the law, it will be observed, apply to
dispositions of securities *within* the State and while in-
formation of those issued in other States and foreign
countries is required to be filed (§§ 6373–9), they are only
affected by the requirement of a license of one who deals
in them *within* the State. Upon their transportation into
the State there is no impediment—no regulation of them
or interference with them after they get there. There is
the exaction only that he who disposes of them there shall

be licensed to do so and this only that they may not appear in false character and impose an appearance of a value which they may not possess—and this certainly is only an indirect burden upon them as objects of interstate commerce, if they may be regarded as such. It is a police regulation strictly, not affecting them until there is an attempt to make disposition of them within the State. To give them more immunity than this is to give them more immunity than more tangible articles are given, they having no exemption from regulations the purpose of which is to prevent fraud or deception. Such regulations affect · interstate commerce in them only incidentally. *Hatch* v. *Reardon,* 204 U. S. 152; *Ware & Leland* v. *Mobile County,* 209 U. S. 405; *Engel* v. *O'Malley,* 219 U. S. 128; *Brodnax* v. *Missouri, id.* 285; *Banker Brothers Co.* v. *Pennsylvania,* 222 U. S. 210; *Savage* v. *Jones,* 225 U. S. 501; *Standard Stock Food Co.* v. *Wright, id.* 540; *Trading Stamp Cases, supra.* With these cases *International Textbook Co.* v. *Pigg,* 217 U. S. 91; *Buck Stove & Range Co.* v. *Vickers,* 226 U. S. 205, and the *Lottery Case,* 188 U. S. 321, are not in discordance.

We might, indeed, ask, When do the designated securities cease migration in interstate commerce and settle to the jurisdiction of the State? Material things, choses in possession, pass out of interstate commerce when they emerge from the original package. Do choses in action have a longer immunity? It is to be remembered that though they may differ in manner of transfer, they are in the same form in the hands of the purchaser as they are in the hands of the seller, and in the hands of both as they are brought into the State. We ask again, Do they never pass out of interstate commerce? Have they always the freedom of the State? Is there no point of time at which the State can expose the evil that they may mask? Is anything more necessary for the supremacy of the national power than that they be kept free when in actual trans-

portation, subjected to the jurisdiction of the State only when they are attempted to be sold to the individual purchaser?  The questions are pertinent, the answer to them one way or the other, of consequence; but we may pass them, for regarding the securities as still in interstate commerce after their transportation to the State is ended and they have reached the hands of dealers in them, their interstate character is only incidentally affected by the statute.

*Decree reversed and the cause remanded for further proceedings in conformity with this opinion.*

MR. JUSTICE McREYNOLDS dissents.