THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, *v.* NATIONAL CANCER HOSPITAL OF AMERICA et al., Defendants.

Supreme Court, Special Term, New York County, January 12, 1951.

*Nathaniel L. Goldstein, Attorney-General (Jerome O. Glucks-man* of counsel), for plaintiff.

*Deane Ramey* for National Cancer Hospital of America and others, defendants.

*L. & J. Rosenberg* for De Haan, Inc., and others, defendants.

HECHT, J. In this action, the Attorney-General seeks an injunction: (a) perpetually restraining defendants National Cancer Hospital of America and De Haan, Inc., as well as the individual defendants who are officers or directors of one or the other corporate defendants " from soliciting, collecting,

receiving or acquiring any monies or other things of value ''
in this State for and on behalf of defendant, National Cancer
Hospital of America; (b) restraining the latter defendant
'' from exercising in this State any corporate rights, privileges
or franchises not granted to it by the laws of this State ''.

The instant motion asks for the same relief *pendente lite.*
The following facts are undisputed.

National Cancer Hospital of America (hereinafter called
'' the hospital '') was incorporated under Michigan laws on
November 30, 1948. Its declared purpose is '' to establish,
build, operate and conduct hospitals for the early detection,
care and treatment of all persons afflicted with cancer or
allied diseases, and to accept gifts, bequests, devises and
contributions for the purpose of acquiring land and building
such hospitals and defraying the necessary expenses for that
purpose.''

On June 22, 1949, the hospital employed defendant De Haan
'' as its exclusive agent for the purpose of raising funds for
the hospital by direct mail advertising, and more particularly
by the use of the Dollar Campaign ''. Thereafter De Haan
mailed from its office in New York City, to many persons in
New York State and elsewhere, a crisp new dollar bill, accom-
panied by a letter on hospital stationery and signed by defend-
ant William F. Everton as its vice-president, which contained
the following statements:

The crisp Dollar Bill is a dramatic means to impress you with the importance
of our appeal. It is not a gift. You will not want it. We will try to show
you, in the next few paragraphs, what it is intended for. You will also learn
of the National Cancer Hospital of America. The enclosed pamphlet tells the
story * * * pointedly, * * * poignantly.

Five million dollars is needed to fight cancer * * *. The many deaths
from cancer may be attributed to a lack of hospital facilities. The cause of
cancer is still unknown but early detection and effective care will effect a cure
in most cases. A cancer patient needs care, attention, comfort, medication,
financial assistance, etc.

For many years now, we have tried to close the gap between the demands
made upon us and the facilities at our disposal but the fight against cancer is
everybody's fight. *Your contribution today to the National Cancer Hospital of
America might preserve lives by providing care.*

We do not intend to overburden your generosity but we deem it a privilege
to be able to contribute to such a cause. We extend that privilege to you and
hope that you will not fail us in our endeavors.

*The enclosed Dollar Bill is part of a special fund provided by one of our
contributors.*

Won't you please return it in the enclosed envelope together with your
contribution. (Italics supplied.)

The enclosed pamphlet has a picture of a hospital which is captioned " proposed new building ". On it the following text appears: " We treat our patients as single beings; they retain their personality and their individuality. Patients are accepted with or without funds. Not one patient in our hospital pays our daily operating costs. Our hospital though located in Detroit, does not belong to Detroit: it does not belong to Michigan. With your dollars to help our fight * * * National Cancer Hospital of America stands ready to render a service to your sick * * * ready to help your stricken townspeople."

" *We need five million dollars.*

" When you send your contribution accompanying the enclosed Dollar Bill you are making secure the foundation of a humanitarian work unexcelled anywhere. Where we cannot cure we are prolonging the life of your loved one * * * keeping homes together. Your contribution will make this possible. Give now, today.

" Give that they may live."

In response to these appeals, $542,000 was collected. The Attorney-General's affidavit alleges that only $100,000 of this amount exists today in tangible assets. Eighty-six thousand dollars is in bank accounts, not in the name of the hospital, but in the joint names of defendant Edward C. Everton (a brother of the hospital's vice-president) and defendant Jules Roloff (an employee of De Haan). Ten thousand dollars was recently deposited as earnest money on the purchase of a parcel of vacant land in Michigan, the purchase price of which is $115,000.

The affidavit of defendant Levien (De Haan's President) admits that $542,000 was collected, but says that $200,000 remains. No information is given, however, as to where this $200,000 is.

The affidavit of defendant Gibson (the hospital's executive secretary) says: " With respect to the amount of contributions received, I now state that every penny can be accounted for and the net assets which comprise funds in the banks in the cities of New York and Detroit and real estate which has been purchased by the defendant in the city of Detroit for the purpose of building a hospital and upon which there has been paid the sum of $72,600 are far in excess of the amount mentioned in the moving papers." However, no accounting is furnished, nor is any statement given, as to the names of the banks and the moneys deposited therein, and no details are given regarding the property alleged to have been purchased.

It also appears without contradiction that National Cancer Hospital of America, as such, does not now maintain and never has maintained any hospital or research facilities, and that it does not care for any patients. Its alleged affiliation with Mercy Hall will be discussed below.

Upon the foregoing undisputed facts, the Attorney-General has made out a clear case of fraud.

The representations made by the defendants in the letter and pamphlet stating the purpose for which the funds are solicited are false because they do not disclose the whole truth. "A false impression is created by the statement of a partial truth and the suppression of facts which would materially qualify the statement made. * * * ' a suppression of the truth may amount to a suggestion of falsehood; and if, with intent to deceive, either party to a contract of sale conceals or suppresses a material fact, he is in good faith bound to disclose, this is evidence of and equivalent to a false representation, because the concealment or suppression is in effect a representation that what is disclosed is a whole truth. The gist of the action is fraudulently producing a false impression upon the mind of the other party; and if this result is accomplished, it is unimportant whether the means of accomplishing it are words or acts of the defendant, or his concealment or suppression of material facts not equally within the knowledge or reach of the plaintiff.' " (*Noved Realty Corp.* v. *A. A. P. Co.,* 250 App. Div. 1, 5–6 [1st Dept.].)

In the case at bar, the representations in the letter and pamphlet lead the reader to believe that his contribution will help supply care for curable cancer patients in defendant's hospital and research which will aid in fighting this dread disease everywhere. Nowhere is there a hint of the true fact that only 18% of the amount collected is available for the humanitarian purpose referred to in the pamphlet.

It is generally understood that any solicitation campaign involves a certain amount of cost, and that the entire amount of the contributions cannot be received by the charity. No general rule can be laid down as to what percentage of cost might reasonably be employed in any appeal for funds so as not to render untruthful a representation that the contribution is designed for the specified charitable purpose. However, it seems clear to the court that where only 18% of the contribution (or even 36% if we accept the unsupported statement of defendant Levien) remains available for the charity, a repre-

sentation is false when it states that all this money is going for that purpose without disclosing the amount of the deductions. It is not necessary for the Attorney-General to prove misappropriation. Each of the deductions may be entirely lawful. The fraud is that the contributor is not told that such a large percentage of his contribution is not going to the charity.

In addition to the foregoing misrepresentation " by a statement of a partial truth and the suppression of facts which would materially qualify statements made " defendant's letter and pamphlet contain two affirmative misrepresentations.

First, the letter states: " The Enclosed Dollar Bill is part of a special fund provided by one of our contributors ". This gives a donor the definite impression that no part of *his* contribution will be diverted to this " Dollar Campaign ". The Attorney-General's affidavit states, without contradiction, that these dollar bills are taken out of the general fund provided by all the contributors. Defendant Edward Everton testified before the Attorney-General that a certain number of new and crisp dollar bills received from contributors are not deposited, but are sent out to new prospects in the " Dollar Campaign ".

Secondly, the pamphlet says that " We [the Hospital] treat *our patients* as single beings * * *. Patients are accepted with or without funds. Not one patient *in our hospital* pays our daily operating costs." (Italics supplied.) The fact is that the National Cancer Hospital does not and never has operated a hospital, and does not and never has treated a single patient.

The affidavit of Miss Gibson, the Hospital's Executive Secretary, states that in 1931 she organized " The Society of Perpetual Help ", a nonprofit Michigan corporation whose charter authorized it to " establish and conduct a hospital home for the maintenance, care and treatment of destitute and indigent persons who are afflicted with incurable cancer ". This corporation started " Mercy Hall Hospital " which grew from an institution of six beds to a large hospital which has apparently performed a very useful function in the treatment of incurable cancer patients. No one in this proceeding has made any attack on Mercy Hospital.

In 1941 Mercy Hospital, which already had a large building of its own, acquired an additional building which it operated under the name of Flower Hospital where it treated patients in the early (and presumably curable) stages. In 1948, according to Miss Gibson's affidavit, counsel for Mercy Hospital

called attention to the fact that its certificate of incorporation confined its powers to the care and treatment of patients afflicted with incurable cancer.

The advisability of amending the old charter was first considered, but for various reasons which have no significance in this proceeding, it was decided to form a new corporation to be known as National Cancer Hospital of America and to vest such corporation with powers which were lacking in the old charter. It was further decided, from the viewpoint of running the hospital, the two corporations were to be regarded as one and that incurable patients would be admitted to the institution as Mercy patients and persons suffering from the disease in the early stages would be admitted as patients of National. Such resolution was thereafter carried out and commencing with the date of its incorporation the defendant corporation has functioned in conjunction with and as a part of its parent corporation, and no distinction has been made with respect to any of the patients in the hospital except as above indicated. Apparently no formal legal proceedings were taken to merge the two corporations. No affidavit is submitted by Michigan counsel to indicate why an amendment to Mercy's charter would not serve the purpose; or why a new corporation had to be formed to take care of curable patients, nevertheless the actual operations of the two corporations could be indissolubly merged into one unit treating both curable and incurable patients. If defendant National contends that this informal merging of operations with Mercy Hall, not pursuant to any proper legal action, eliminates the falsity of the statements in the pamphlet described above, then the pamphlet becomes false in another material respect.

The only reference in the pamphlet to the relationship between defendant Hospital and Mercy is a single sentence saying: "The National Cancer is an outgrowth of Mercy Hall Hospital founded in 1931." The emphasis in defendant's letter and pamphlet is that the money contributed is to be used for curable cases. Anyone reading these documents would not understand the fact as it is now alleged in Miss Gibson's affidavit that the money received by National is being used indiscriminately for curable and incurable cases.

My conclusion that defendants have obtained contributions by affirmative misrepresentations and by failing to disclose all material facts is borne out by the striking weakness of the opposing affidavits.

Here we have an action brought by the Attorney-General charging that out of $542,000 collected for charitable purposes, only $100,000 remains available for those purposes. A bona fide charity, faced with such a charge, would hasten to give a complete accounting to the Attorney-General and the Supreme Court. Instead, defendants make vague promises about giving an accounting at some future date, but no present explanation is given as to what was done with the money.

As pointed out above, the moneys still remaining in defendant's hands are in bank accounts in the name of individual employees of the respective corporate defendants, and not in the name of defendant hospital. The explanation offered in the affidavit of the hospital's attorneys is "that the account was first opened in the name of the hospital, but that the bank had later requested that it be withdrawn because of administrative difficulties. The account was then opened in the names of Everton and Roloff and they executed and delivered to the hospital a letter in which they acknowledged that the funds in the account belonged to the hospital." The letter addressed by these individuals to the hospital reads: "This is to advise you that the bank account which was recently opened in the Manufacturers Trust Company under our names are funds belonging to you and that all funds deposited to that account are your property, that we are signatories on that account through your direction and we are not to draw any funds from said account without your consent and approval." No affidavit is submitted from the bank stating that it had requested that the account in the hospital's name be withdrawn because of administrative difficulties. Nor can I perceive how any administrative difficulties would arise if the account were being properly handled. The casual letter written by the individuals to the hospital falls far short of giving the latter the complete control over the contributions which the contributors thought they were effectuating when they drew their checks to the order of the hospitals as requested in the letter.

Since the Attorney-General has established these fraudulent acts of all the defendants in this State, it is his right and duty to bring this action, to enjoin continuation of the fraud. This applies both to defendant De Haan (a domestic corporation, General Corporation Law, § 60; Civ. Prac. Act, § 1217; *People* v. *Ballard,* 134 N. Y. 269), and to defendant hospital (a foreign corporation, Civ. Prac. Act, § 1217, subd. 2; *People* v. *National Assn. of Certified Public Accountants,* 204 App. Div. 288,

291–292). It is immaterial whether or not the latter is engaged in interstate commerce as the Attorney-General may still involve the State police power to enjoin it in this State from mailing letters, soliciting contributions or receiving money, where fraudulent representations are made by it. (*Hall* v. *Geiger-Jones Co.*, 242 U. S. 539, 557–559.)

In such action a temporary injunction should issue.

Since defendants contend that they can meet all of the charges, they should be given an opportunity for an immediate trial and the order to be entered hereon shall so provide.

As to the second branch of the motion, that will be granted upon the authority of the well-reasoned opinion of BOTEIN, J., in *People* v. *Jewish Consumptives' Relief Soc.* (196 Misc. 579). Defendant hospital and defendant's agents will be restrained from doing any business in this State without a proper certificate of authority.

Defendant De Haan has attempted to justify the improper practices here by the arguments that they are commonly used in charity drives. If this be so, it seems to me desirable for the Law Revision Commission to consider legislation requiring all appeals for charitable contributions to state distinctly how much is being deducted for campaign costs, etc., and how much is being remitted to the charity; to require all such drives to file proper accountings with a designated State agency; and to outlaw dollar campaigns and similar diversions of charitable contributions to such speculative and unwarranted purposes. Settle order.