# RICHARD D. HOHENSEE *v.* STATE OF MARYLAND

[No. 956, September Term, 1978.]

*Decided April 19, 1979.*

The cause was argued before GILBERT, C. J., and LISS and MACDANIEL, JJ.

*Bradford C. Peabody, Assistant Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellant.

*Alexander L. Cummings, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General, Andrew L. Sonner, State's Attorney for Montgomery County,* and *DeLawrence Beard, Assistant State's Attorney for Montgomery County,* on the brief, for appellee.

GILBERT, C. J., delivered the opinion of the Court.

We are here called upon to decide whether the evidence adduced at a criminal trial in the Circuit Court for Montgomery County for violating Maryland Corporations and Associations Code Annotated, Title 11, Maryland Securities Act, Subtitle 4, § 11-401 was sufficient to sustain the conviction. As a prelude to discussing the matter now before us, a brief review of some historical data relative to the Maryland Blue Sky legislation is in order.

## HISTORY OF THE MARYLAND SECURITIES ACT.

According to D.H. Miller,[1] 23 Md. L. Rev. 289 (1963), *A PROSPECTUS ON THE MARYLAND SECURITIES ACT,* the first Maryland law dealing with "Blue Sky"[2] was enacted in 1920. It conferred upon "the Attorney General the power to investigate and deal with frauds in the offering and sale of securities. . . ." *Id.* Following the economic disaster that befell the nation in the early 1930's, the federal government put itself into the regulation of securities by the enactment of the Securities Act of 1933. Apparently, the federal authorities' entry into security regulation led to a minimum of activity in the area on the part of the State. The situation seems to have remained static in Maryland until the National Conference of Commissioners on Uniform Laws and the American Bar Association approved the Uniform Securities Act in 1956.[3]

A Joint Resolution of the General Assembly in 1961 led to the appointment of a committee "to study the Maryland situation and to report on the adequacy of the Maryland Blue

---

1. Mr. Miller was the Securities Commissioner for the State of Maryland at the time he wrote the article. An excellent article on the subject of deceit in securities transactions may be found in H.M. Brune, *RULE 10b-5 AND THE GENERAL LAW AS TO DECEIT IN SECURITIES TRANSACTIONS IN MARYLAND,* 33 Md. L. Rev. 129 (1973).

2. In Hall v. Geiger-Jones Co., 242 U. S. 539, 550, 37 S. Ct. 217, 220-21, 61 L. Ed. 480, 489 (1917), "Blue Sky" refers to a "security" which may be far from secure, if indeed not actually "insecure." It means that the "security" has no more basis than "so many feet of blue sky." *See also* D.H. Miller, 23 Md. L. Rev. 289, n. 2.

3. D.H. Miller, 23 Md. L. Rev. 289 (1963), *supra,* at 290-91.

Sky Law." [4] The Committee concluded that the Maryland law was inadequate and recommended the adoption of a version of the Uniform Securities Act. [5] With only minor amendments, the matter passed both Houses of the Legislature and became law on July 1, 1962. [6]

Mr. Miller states in his article that:

> "The Maryland Securities Act is an attempt to do four things. First, it imposes a standard of honesty and truthfulness upon every transaction involving an offer to buy or sell a security, regardless of the size of the transaction or the sophistication (or lack of it) of the parties. This standard is implicit in the anti-fraud provisions. Secondly, it provides for the regulation of those engaged in the business of buying and selling securities. Thirdly, it regulates certain offerings of securities with the principal purpose of assuring that full disclosure of the material facts will be made to every prospective investor. Finally, it provides administrative, civil, and criminal remedies in cases where the standards prescribed by the Act are not met. In sum, the Act roughly approximates locally the coverage of the two principal federal securities laws: the Securities Act of 1933 and the Securities Exchange Act of 1934." (Footnotes omitted.) 23 Md. L. Rev. at 291-92.

The Maryland Act was codified as Maryland Annotated Code art. 32A. A security was defined in then section 25 (1) in broad and flexible terms. [7] *Ibid.* The entire Act revolved

---

4. *Id.* at 291.

5. *REPORT OF COMMITTEE TO STUDY THE ADMINISTRATION OF THE BLUE SKY LAW OF MARYLAND,* 1961. *See also* 23 Md. L. Rev. at 291.

6. 23 Md. L. Rev. at 291.

7. Former Md. Ann. Code art. 32A, § 25 (1) defined "security" as:

"any note; stock; treasury stock; bond; debenture; evidence of indebtedness; certificate of interest or participation in any profit-sharing agreement; collateral-trust certificate; preorganization certificate or subscription; transferable share; investment contract; voting-trust certificate; certificate of deposit for a security; certificate of interest or participation in an oil, gas,

around the meaning of three words, *scilicet:* 1) *security;* 2) *offer;* [8] and 3) *sale.* [9] The thrust of the Act, through the registration and regulation of the offer or sale of securities, is to prevent the perpetration of fraud on the citizenry. Offers and sales generally were to be made by a "broker-dealer," a "person engaged in the business of effecting transactions in securities for the account of others or his own account." [10] An "agent" was any person "other than a broker-dealer who represents a broker-dealer or issuer in effecting or attempting to effect purchases or sales of securities." [11] As with many regulatory laws, there were exceptions which took the form of "exempt securities" [12] or "exempt transactions." [13] Among the transactions that were exempt [14] from the ambit of the Act were:

> "*Any transaction pursuant to an offer directed by the offeror to not more than twenty-five persons* (other than those designated in paragraph (8)) *in this State during any period of twelve consecutive months,* whether or not the offeror or any of the offerees is then present in this State, if the seller reasonably believes that all the buyers in this State, other than those designated in paragraph (8), are purchasing for investment; but the Commissioner may by rule or order, as to any security or transaction or any type of security or transaction, withdraw or further condition this exemption, or

---

or mining title or lease or in payments out of production under such a title or lease; or, in general, any interest or instrument commonly known as a "security," or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing. "Security" does not include any insurance or endowment policy or annuity contract under which an insurance company promises to pay money either in a lump sum or periodically for life or some other specified period."

8. *See* Md. Ann. Code (1957 ed.) art. 32A, § 25 (j) (2).
9. *Supra,* n. 8, § 25 (j) (1).
10. Md. Ann. Code (1957 ed.) art. 32A, § 25 (b).
11. *Supra,* n. 10, § 25 (a).
12. Md. Ann. Code (1957 ed.) art. 32A, § 26 (a).
13. *Supra,* n. 12, § 26 (b).
14. *Ibid.,* § 26 (b) (9).

increase or decrease the number of offerees permitted, or waive the condition relating to their investment intent. . . ." [15] (Emphasis supplied.)

So much for the history of the Act. We turn now to the statute under which the prosecution was brought in the instant case.

## THE LAW.

The current Maryland Securities Act, codified in Maryland Corporations and Associations Code Annotated, Title 11 tracks to a great extent its predecessor, Article 32A. It is safe to say, but for very few substantive changes, the recodification under Title 11 produced only stylistic alterations. Thus, for all intents and purposes, the 1962 Act remains intact.

Corporations Art. § 11-101 (o) defines "Security" in 141 words, a net decrease of five (5) words since the original Act of 1962. *See* n. 7, *supra.* Section 11-101 (o) now reads:

"(o) *Security.* — (1) "Security" means any:
(i) Note;
(ii) Stock;
(iii) Treasury stock;
(iv) Bond;
(v) Debenture;
(vi) Evidence of indebtedness;
(vii) Certificate of interest or participation in any profit-sharing agreement;
(viii) Collateral-trust certificate;
(ix) Preorganization certificate or subscription;
(x) Transferable share;
(xi) Investment contract;

---

15. Md. Ann. Code (1957 ed.) art. 32A, § 26 (b) (8), not applicable here, provided:

"Any offer or sale to a bank, savings institution, trust company, insurance company, investment company as defined in the Investment Company Act of 1940, pension or profit-sharing trust, or other financial institution or institutional buyer, or to a broker-dealer, whether the purchaser is acting for itself or in some fiduciary capacity. . . ."

(xii) Voting-trust certificate;

(xiii) Certificate of deposit for a security;

(xiv) Certificate of interest or participation in an oil, gas, or mining title or lease or in payments out of production under the title or lease; or

(xv) In general, interest or instrument commonly known as a "security"; or

(xvi) Certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase any of the preceding.

(2) "Security" does not include any insurance or endowment policy or annuity contract under which an insurance company promises to pay money either in a lump sum, periodically for life, or some other specified period."

The appellant, Richard D. Hohensee, was charged in an eight count indictment with violating the Maryland Securities Act. Although the indictment was handed down in June 1976, the matter did not proceed to trial until April 1978. Hohensee was convicted of violating Corporations art. § 11-402.[16] That section provides:

"It is unlawful for any broker-dealer or issuer to employ an agent unless the agent is registered. When an agent terminates a connection with a broker-dealer or issuer or terminates those activities which make him an agent, the agent and the broker-dealer or issuer shall promptly notify the Commissioner."

An "agent," according to section 11-101 (b) (1), is "an individual other than a broker-dealer who represents a broker-dealer or issuer in effecting or attempting to effect the purchase or sale of securities," but the meaning of "agent"

---

16. At the close of the State's case, the trial judge granted a judgment of acquittal as to five counts of the indictment. The case went to the jury on the remaining three counts. Appellant was convicted on Count I, but found not guilty on the other two charges.

does not "include an individual who represents an issuer in: . . . (ii) Effecting a transaction exempted by § 11-602 of this title. . . ." § 11-101 (b) (3).

The statute, as did its predecessor, contains a section that exempts certain transactions from the breadth of the Securities Act. Current Title 11, § 11-602 declares in pertinent part that:

> "The following transactions are exempted from §§ 11-205 and 11-501 of this title:
>
> . . . .
>
> (9) Any transaction under an offer directed by the offeror to not more than 25 persons, other than those designated in item (8) of this section, in this State during any period of 12 consecutive months, whether or not the offeror or any offeree is then present in this State, if the seller reasonably believes that all the buyers in this State, other than those designated in Item (8) of this section, are purchasing for investment, but the Commissioner by rule or order, as to any security or transaction or any type of security or transaction, may withdraw or further condition this exemption, increase or decrease the number of offerees permitted, or waive the condition relating to their investment intent. . . ." [17]

Subsection 8 of section 11-602 is identical to that contained in the old law. *See* n. 15, *supra*.

Sections 11-205 and 11-501 provide:

§ 11-205:

> "The Commissioner by rule or order may require the filing of any prospectus, pamphlet, circular, form

---

17. The changes between the present statute and the former one, quoted above, are stylistic only. We do note that there is nothing in the record to indicate any rule or order on the part of the Commissioner that withdrew or conditioned the exemption, but the Code of Maryland Regulations, Title 02 of the Law Department, Subtitle 02, Division of Securities, Chapter 02, Section .07, does set forth the Commissioner's rule relative to transactional exemptions. The content of the rule, however, was not made known to the trier of fact in the instant case, nor is there any evidence to indicate a violation of the rule had it been made known.

letter, advertisement, or other sales literature or advertising communication addressed or intended for distribution to prospective investors, including clients or prospective clients of an investment adviser, unless the security or transaction is exempted by Subtitle 6 of this title." [18]

§ 11-501:

"It is unlawful for any person to offer or sell any security in the State unless:

(1) It is registered under this title; or
(2) The security or transaction is exempted under Subtitle 6 of this title."

The penalty prescribed for violating any provision of the Act is "a fine not exceeding $5,000 or imprisonment not exceeding three years or both." § 11-705 (a).

## THE FACTS

In 1968, the appellant and his wife purchased approximately 130 acres of land near Winchester, Virginia and began to operate a trailer camp under the name of Magic Mountain. Appellant was an incorporator and director of the Virginia corporation, Magic Mountain Recreation Area, Inc. Four years later, the appellant formed a limited partnership to sell investment shares in his trailer camp. The partnership was known as Magic Mountain Park Limited Partnership. Appellant selected one James K. Brewer to sell the shares for appellant. Brewer, however, did not register with the Maryland Securities Commission as an agent for Magic Mountain Limited Partnership.

Fred G. O'Fiesh, the Assistant Securities Commissioner for Maryland, told the jury in the circuit court that the records of the State Securities Division had "no records of any registration of Magic Mountain, Inc. as a limited partnership. . . ." Moreover, Brewer "was never registered as

---

18. The Revisor's note states:

"This section formerly appeared as Article 32A, § 27. The only changes are technical changes in style."

an agent by the Division for Magic Mountain." The records of the Division were also negative as to appellant's registration. The sale of limited partnership shares required registration. An inference may be drawn from the transcript of O'Fiesh's testimony that he referred the matter of the sale of the unregistered limited partnership shares by an unregistered agent to the Montgomery County State's Attorney's office.

When O'Fiesh was interrogated relative to section 11-602 (9), he explained that the limitation to twenty-five offerees meant that the offering was a small closed one "without any public solicitation. They want to permit . . . [a] man to raise his additional capital to expand his business without the necessity of registration which requires time, effort and expense." The witnesss further said, "That section [11-602 (9)] has been supplemented by a rule which now has a thirty-five purchaser concept. . . ." He added, "[I]f one of the offerees can be determined not to be sophisticated and knowledgable [*sic*] with respect to the venture, that also knocks out the possibility of exemption."

Brewer identified himself at trial as an "independent insurance agent." He acknowledged that he had pleaded guilty to a felony charge in 1977 in Montgomery County. The charge was "selling a security without a license." As part of the disposition in that case, Brewer agreed to testify in the case *sub judice.*

Brewer told the jury that he met appellant "through" a Quentin Adams. Adams advised Brewer that appellant was "interested in developing a park." A meeting occurred "in the fall of 1972" with appellant. It was agreed that Brewer and his then partner were to receive "ten percent" commission on each sale of a limited partnership interest, in addition to "a small ownership" of the business.

Brewer testified that he, his partner and four salesmen did sell limited partnership shares in Magic Mountain. He said that he, personally, made "twelve to fourteen" offerings. The four salesmen made "not more than half a dozen" offerings. There may have been three sales in addition to those made by Brewer, and they were separate from the "half dozen

offers." Brewer sold six to eight interests to individuals in Maryland. The sales were for three thousand dollars ($3,000) each, "of which fifteen hundred was to be put up in cash." A note was taken for the balance. The total dollar value of the shares sold by Brewer, his partner and the salesmen "was in the neighborhood of a little over $43,000.00."

During cross-examination, Brewer said that while shares in the limited partnership originally sold for $3,000 each, they were "raised to forty-five hundred": three thousand dollars ($3,000) cash and a note for fifteen hundred dollars ($1,500). Brewer never told appellant that he, Brewer, was not a registered agent in Maryland for the purpose of selling securities. In fact, he related that because of a prior registration with a broker-dealer he thought he was permitted lawfully to sell the limited partnership interest. Moreover, he believed it was "a private placement," and that it did not "have to be registered." Brewer stated there were not more than "twenty-eight, thirty investors, . . . [so as to stay] within the framework of what we thought to be the law." Brewer testified that thirty-five to forty would be an accurate figure as to the total number of offerees.

When asked how many offers were made outside of Maryland, Brewer replied, "Percentage-wise, maybe half; *fifty percent of the offers were made outside of the State of Maryland."* The trial judge then asked, "Fifty percent in the State and fifty percent outside of the State?" Brewer answered, "Right. *Outside the State does not include the District of Columbia."* (Emphasis supplied.)

Later on, in response to the questions "How many offers did you make in the State of Maryland? Do you have any way of telling?" Brewer admitted, "Not really."

Because appellant did not "register the limited partnership" by filing it in the appropriate courthouse, Brewer and his group "called a halt to . . . [the] selling."

The record indicates that the appellant proposed to file the limited partnership agreement when all the shares available for sale were sold. Matters never reached that point, however, because with the exit of Brewer and his crew, the "Magic"

was gone and the "Mountain," figuratively speaking, fell on appellant Hohensee in the form of an indictment.

In this Court, the appellant strongly contends that the evidence is insufficient to sustain the conviction.[19]

It is apparent from the testimony that the sale of the limited partnership shares fell within the exemption set out in section 11-602 (9) in that offers were made, according to the evidence produced by the State, to thirty-five to forty persons, half of whom were outside the State of Maryland. No more than 17 to 20 offers were made within Maryland. Moreover, Brewer treated the District of Columbia as being part of the State of Maryland in arriving at the 17 to 20 figure. Thus, Brewer's estimate is grounded on a false premise. Nevertheless, if we accept it as true, *arguendo,* the number of offerings is still less than the twenty-five permitted by section 11-602 (9).

The employment of Brewer as an agent, by the appellant, was for the purpose of making offers of sale of an exempt transaction. That being the situation, it was immaterial that the agent was not registered with the Securities Commissioner.

The count of the indictment upon which appellant was convicted specifically charged that the appellant unlawfully employed an unregistered agent, but as we have seen the evidence shows that there was no need for the agent to be registered because the offering was exempted from the ambit of the Maryland Securities Act by section 11-602 (9).

In our view, the evidence failed to demonstrate that the appellant was guilty of the offense charged.[20] In fact, the evidence clearly established that he was not guilty of the

---

19. The statute provides in section 11-604 that:

"In any proceeding under this title, the burden of proving an exemption or an exception from a definition is on the person claiming it."

The constitutionality of the burden of proof proviso is not raised on appeal. We do not decide it. *But see* Evans v. State, 28 Md. App. 640, 349 A. 2d 300, *aff'd,* 278 Md. 197, 362 A. 2d 629 (1976).

20. Regardless of whether the appellant carried the "burden" of proving that the transactions in the instant case were exempted from the Securities Act, the evidence clearly demonstrates that the "burden" was met. *See* n. 19, *supra.*

offense charged because of the exemption conferred by section 11-602 (9). The motion for judgment of acquittal as to Count I should have been granted.[21]

*Judgment reversed.*
*Costs to be paid by Montgomery County.*

---

**21.** If we had not reached this result today, we, nonetheless, would be constrained to vacate the sentence and remand for resentencing. The record clearly shows that the trial judge imposed a two-year sentence, which he then suspended, thereafter imposing a two-year term of probation, subject to the special condition that Hohensee pay the Public Defender's fee. After determining what amount the appellant was able to pay, the court increased the term of probation to three years. While conditioning probation on payment of the Public Defender's fee is permissible, Md. Ann. Code art. 27A, § 7 (g), *c.f.,* Haynes v. State, 26 Md. App. 43, 337 A. 2d 130 (1975), the increase in the term of probation violated Rule 774 (b). That rule gives the trial court broad revisory power over the sentence for a period of ninety days. However, the rule patently forbids any increase in the sentence. Consequently, the increase in the term of probation was impermissible.