SECURITIES AND EXCHANGE
COMMISSION, Plaintiff,

v.

Charles W. STEADMAN, Steadman Security Corporation, Steadman Financial Fund, Steadman Investment Fund, Steadman Oceanographic, Technology & Growth Fund, Steadman American Industry Fund, and Steadman Associated Fund, Defendants.

Civ. A. No. 89–2026–LFO.

United States District Court,
District of Columbia.

Feb. 27, 1991.

Memorandum on Motion to Stay
May 1, 1991.

Permanent Injunction Filed
May 1, 1991.

David S. Horowitz, U.S.S.E.C., Philadelphia, Pa., for plaintiff.

Peter J. Nickles, Coleman S. Hicks, Jay T. Smith, Covington & Burling, Washington, D.C., for defendants.

## MEMORANDUM

OBERDORFER, District Judge.

Plaintiff Securities and Exchange Commission ("SEC") seeks to enjoin defendants Charles W. Steadman, Steadman Security Corporation ("SSC"), Steadman Financial Fund, Steadman Investment Fund, Steadman Oceanographic, Technology & Growth Fund, Steadman American Industry Fund, and Steadman Associated Fund (collectively "the Funds") from violations of federal securities laws. During a period from 1971 to 1988 the Funds sold shares to residents of the states but did not register under state securities laws ("Blue Sky laws"). The SEC asserts that, as a result of defendants' failure to register under state laws, the Funds accrued undisclosed and unrecognized liabilities for fees, penalties, and shareholder rescission suits. The SEC further contends that defendants' failure to recognize this liability from 1971 to 1989 resulted in material misstatements of net asset value ("NAV") of the Funds' shares.

SEC alleges the following eight causes of action against defendants: (1) That defendants' misstatements of NAV defrauded investors, violating section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a), section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5; (2) that SSC, aided and abetted by Steadman, used the mails in connection with a fraud in violation of sections 206(1) and (2) of the Investment Advisers Act of 1940 ("Advisers Act"), 15

U.S.C. §§ 80b–6(1) & (2); (3) that the Funds, aided and abetted by Steadman, violated section 22(c) of the Investment Company Act ("ICA") of 1940, 15 U.S.C. § 80a–22(c), and Rule 22c–1, 17 C.F.R. § 270.22c–1; (4) that defendants failed to disclose material facts in reporting to the SEC in violation of section 34(b) of the ICA, 15 U.S.C. § 80a–33(b); (5) that from November, 1985 to May, 1986 defendant SSC performed advisory services for the Funds without approval from the boards of trustees in violation of section 15(a) of the ICA, 15 U.S.C. § 80a–15(a); (6) that SSC, aided and abetted by Steadman, improperly maintained custody of client funds in violation of section 206(4) of the Advisers Act, 15 U.S.C. § 80b–6(4), and Rules 206(4)–2(a)(2)(ii) and (a)(5), 17 C.F.R. § 275.206(4)–2(a)(2)(ii) and (a)(5); (7) that defendant SSC failed to file required forms in violation of section 204 of the Advisers Act, 15 U.S.C. § 80b–4, and Rule 204–1(a)(1), 17 C.F.R. 275.204–1(a)(1); and, (8) that SSC failed to file proper reports in violation of section 17A(d)(1) of the Exchange Act, 15 U.S.C. § 78q–1(d)(1) and Rule 17Ad–13(a), 17 C.F.R. 240.17Ad–13(a).

The SEC moved for preliminary injunction in the early stages of this case. On August 4, 1989, an evidentiary hearing on that motion was held. Before the motion for preliminary injunction was decided, however, the parties entered into settlement negotiations. In October, 1990, the SEC moved for summary judgment on all charges except those arising under section 15(a) of the ICA, 15 U.S.C. § 80a–15(a). In support of and in opposition to the summary judgment motion, the parties presented supplemental briefs and affidavits and oral argument. However, the case was not resolved on summary judgment and proceeded instead to trial. On November 7 and 8, 1990, the parties presented evidence on all factual matters not addressed at the preliminary injunction and summary judgment stages. Witnesses ratified earlier deposition testimony and the parties supplemented the record with designated portions of that deposition testimony.

## I.

### A.

Defendant Charles Steadman is Chairman of the Board, President, Chief Executive Officer, and Treasurer of SSC and Chairman of the Board of Trustees and President of each fund. Steadman is a graduate of the Harvard Law School and served as legal counsel to mutual funds organized by the Steadman family from the early 1950's to the early 1960's. From the early 1960's on, Steadman has served as an officer and director of mutual funds owned by the family. *See* Transcript (November 7, 1990) ("1990 Tr. I") at 125–26 and 144. SSC is a Delaware corporation owned by United Securities, Inc., which maintains offices in Washington, D.C. United Securities is a Maryland corporation whose sole shareholders are the three adult children of Mr. Steadman. SSC became registered with the SEC as an investment adviser on December 31, 1971.

The Funds are five no-load, open-end management investment companies organized as common law trusts under the laws of the District of Columbia. In 1971–72, the Funds had net assets of approximately $130–135 million and 75,000 shareholder accounts. *See* 1990 Tr. I at 117–18. However, as of mid–1989, the Funds' net assets were approximately $28.9 million in over 25,000 shareholder accounts. Complaint & Answer ¶ 12. The Funds' shareholders include residents of all fifty states. SSC supervises the Funds' relations with federal and state regulatory bodies pursuant to investment advisory agreements with each of the Funds and subject to the direction of the Trustees of the Funds.

Prior to 1971, the Funds maintained sales offices and employed sales personnel in various locations in the United States and were registered under the Blue Sky laws of the applicable jurisdictions. In 1971 the Funds changed their manner of doing business. They closed their sales offices, terminated their sales personnel, and operated thereafter strictly on a "mail order" basis. In conjunction with this switch to mail order sales, the Funds ceased renewing registrations under state Blue Sky laws and

allowed then existing registrations to lapse. In the majority of states, the Funds have not been registered since the early 1970's, although in two states the Funds were registered as late as 1978.

Defendants assert that the decision to discontinue state registrations was based on an opinion letter written in the early 1970's by Carl Shipley, a private attorney who was general counsel to at least three of the five funds and Director of the Oceanographic Fund, Inc. *See* Plaintiff's exhibit ("Pl. ex.") 14. Peter Nunn, the Coopers & Lybrand accountant who was responsible for auditing defendants' financial statements, also relied upon Shipley's opinion. *See* 1990 Tr. I at 87; Designated Deposition of Peter Nunn ("Nunn Dep.) at 43; Transcript of Hearing on Motion for Preliminary Injunction (August 4, 1989) ("1989 Tr.") at 59. However, neither Steadman nor Nunn have seen a copy of the original opinion letter since the early 1970's. 1989 Tr. at 76 & 91–92. Unable to produce the 1971 letter, which Steadman and Nunn remembered as being several pages long, defendants instead produced from a file used in 1974 board meetings a single page, unsigned, undated letter on SSC stationary addressed to the Steadman American Industry Fund from Carl Shipley, General Counsel, opining that state registration was unnecessary. *See* 1990 Tr. I at 87 & 108, *see also infra* at § III–B. Steadman testified that this letter was not the original one relied on by defendants in 1971. 1990 Tr. I at 108.

On September 25, 1974, at meetings of the boards of directors, four of the five Funds resolved to conduct distribution on a mail order basis, following a discussion of the costs of state registration. *See* Pl. ex. 14. Mr. Steadman testified that Shipley's opinion was discussed extensively at those meetings. 1990 Tr. I at 107. However, neither the resolution nor the minutes of the meetings make any reference to a decision to permit state Blue Sky law requirements to lapse or to Mr. Shipley's legal opinion that registration was not required.

Upon the advice of Mr. Steadman and SSC the Funds took the position that sales were effected only in the District of Columbia, a jurisdiction that does not require registration. This position was disclosed to shareholders, who were required upon application to sign a statement of understanding that the Funds' shares were not registered "under the local laws of the various states" and that the rights of the applicant were governed exclusively by the laws of the District of Columbia and the United States. *See* Steadman Declaration (July 31, 1989) ("1989 Steadman decl.") at ex. 3. Similarly, beginning in 1971, the Funds' prospectuses stated: "Fund shares are not registered under the local laws of the various states.... The rights of investors are governed exclusively by federal laws and the laws of the District of Columbia ..." *See id.* at ex. 2. The prospectuses made no mention of state laws requiring registration, of Supreme Court decisions upholding state application of Blue Sky laws, or of the risk that the states could assert fines and penalties and investors could rescind purchases upon a determination that state law in fact required registration. *See, e.g., Hall v. Geiger–Jones Co.,* 242 U.S. 539, 550, 37 S.Ct. 217, 220, 61 L.Ed. 480 (1917); *Travelers Health Ass'n v. Virginia,* 339 U.S. 643, 70 S.Ct. 927, 94 L.Ed. 1154 (1950).

From at least 1970 until May 26, 1988, defendants forwarded the Funds' prospectuses and investment applications to residents of the various states through the mails, almost exclusively upon written or telephone request by potential investors. However, at times, though not continuously, defendants also solicited investors directly. For example, defendants sent a promotional mailing to 10,000 potential investors in conjunction with U.S. Life Insurance Company and another promotional mailing to 30,000 potential investors who are subscribers of *Money Magazine, Country Living, Life Style,* and *Changing Times.* In addition, defendants advertised in the *Washington Post* and the *Eastern Airline Shuttle Magazine.* The advertisements included a coupon which could be detached and mailed to the Funds' offices in Washington, D.C., in order to request a Prospectus.

### B.

The SEC began investigating defendants' failure to register under state Blue Sky laws and other activities in 1987–88. In the course of its investigation and in preparation of this case, the SEC surveyed the fifty states to determine the state registration requirements and fees the Funds would have paid had they registered since 1971. The results of the SEC's survey revealed that forty-six states require registration of mutual fund shares. For each state that requires registration, the SEC determined the minimum initial registration fee and the minimum subsequent annual fee from the "Investment Company Institute Blue Sky package." *See* Declaration of Peter Smith (October 15, 1990) ("Smith decl.") at ¶ 3. For example, many states charge a minimum fee plus a percentage of anticipated sales. The minimum ranges from $50 to $1000. Using the minimum for each state, for each fund, for each year in which the Funds failed to register, the SEC calculated defendants' minimum liability to be $694,020. *Id.* at ¶¶ 7–8; Affidavit of Peter Smith (July 17, 1989) ("Smith aff.") ¶ 24(f). The SEC calculated defendants maximum liability for fees to be $3,351,409. *See id.* These estimates did not include any provision for shareholder rescission suits, no attorney's fees, no interest, and no penalties.

In September, 1988, after the SEC began its investigation, the trustees resolved to seek a buyer for the Funds and, if no sale was effectuated by January 31, 1989, to liquidate the Funds in cash payments to the shareholders. *See* 1989 Steadman decl. at ¶ 15. That date passed, the Funds were not liquidated, and several further resolutions and agreements towards liquidation were made but not executed. *See, e.g.,* Smith aff. at ¶¶ 37–41. Defendants maintain that SEC attempted to force the Funds to liquidate and that the Trustees have consistently held the view that effecting liquidation by a transfer of assets to an ongoing fund was preferable to distributing cash to shareholders. 1989 Steadman decl. at ¶¶ 13–17.

In June, 1989, defendants retained Philip Lehmkuhl as counsel for the Funds to contact the securities commissions of each state, to determine what claims, if any, the states would assert against defendants for the failure to register, and to settle claims against the Funds by the states. Lehmkuhl was retained only by the Funds and did not have authority to discuss or settle claims by the states against SSC or Steadman. Transcript (November 8, 1990) ("1990 Tr. II") at 25. However, Lehmkuhl testified that the Funds have "virtually no employees" and that he communicated mainly with Steadman and Max Katcher, executive vice president of SSC and treasurer of the Funds. *See id.* at 31; Designated Deposition of Philip Lehmkuhl ("Lehmkuhl Dep.") at 16.

On June 16, 1989, Lehmkuhl wrote to the states informing them (in the first paragraph) that the Funds planned to liquidate their assets. Thereafter, the letter disclosed that the Funds had not registered with any state for 17 years. Attached to each letter was a summary of sales data in that state from 1984–1989. In closing, the letter requested a response as to whether the state intended to take some enforcement action against the Funds for their failure to register. *See* Pl. ex. 47. Forty-four states responded. By October, 1990, financial settlements had been reached between twenty-five states and the Funds, as a result of which the Funds have made payments to the states totaling $100,646. *See* Declaration of Max Katcher (Oct. 25, 1990) ("Katcher decl.") ¶ 1. The states typically based their settlement demands on fees that would have been paid or a multiple of the fees that would have been paid. *See* 1990 Tr. II at 28; Lehmkuhl Dep. at 93–94. However, some states that did not seek financial relief nonetheless sought either cease and desist orders or consent decrees providing that defendants would not sell in those states again without registering under the state laws. *See* 1990 Tr. II at 27. As of October, 1990, settlement with the Funds had been reached in all but six states. *See* Katcher decl. at ¶ 1.

At least some of the states based their settlement positions on defendants' repre-

sentation that they intended to effectuate a cash liquidation of the Funds. The states, seeking to minimize depletion of shareholders' assets, settled with defendants for less than they would demanded have had they been informed that defendants planned to transfer the Funds' assets. For example, Ellyn L. Brown, the Securities Commissioner of the State of Maryland, attested that Maryland did not plan to take enforcement action against the Funds but that "[t]his decision was made in large part on the representation of the Funds' counsel that the Funds would liquidate (*i.e.* return all available cash to the Funds' shareholders for their shares of the Funds)...." Affidavit of Ellyn Brown (August 3, 1989) ("Brown Aff.") at ¶¶ 3–4. Because of this representation, the Maryland Division of Securities "determined to avoid further depletion of the assets of the Funds available to investors in that the apparent failure of the Funds' adviser to register shares was not the responsibility or fault of investors." *Id.* at ¶ 5. At the August 4, 1989 hearing, Lewis W. Brothers, Jr. from Virginia's Division of Securities also testified that Virginia's settlement position was based on liquidation of the Funds. 1989 Tr. at 49. When Lehmkuhl became aware in February or March of 1990 that defendants were contemplating a transfer of the Funds' assets rather than cash liquidation, he contacted the states a second time to inform them that liquidation was not the only possible course of action defendants might take. Lehmkuhl Dep. at 31. Lehmkuhl testified that following the receipt of that information, the states changed their settlement positions. However, he could not

testify as to whether the changes were due to their receipt of his information that the Funds no longer planned to liquidate. *Id.* at 36.[1]

Following the SEC investigation, in July, 1989, the Funds began to recognize contingent liabilities arising out of non-registration in calculating NAV. At that time, the Funds accrued liabilities of $78,150 for state claims arising out of non-registration and an additional $50,000 for shareholder rescission claims. *See* Declaration of Max Katcher (July 31, 1989) ("Katcher decl.") at ¶¶ 11 & 16.

## II.

### A.

This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act, 15 U.S.C. 77v(a), Section 27 of the Exchange Act, 15 U.S.C. 78aa, Section 44 of the ICA, 15 U.S.C. 80a–43, and Section 214 of the Advisers Act, 15 U.S.C. 80b–14.

### B.

In *Hall v. Geiger–Jones Co.*, 242 U.S. 539, 550, 37 S.Ct. 217, 220, 61 L.Ed. 480 (1917), the Supreme Court held that states may exercise their police power to protect the public against "speculative schemes which have no more basis than so many feet of 'blue sky.'" Since 1917, the Court has continued to uphold the constitutionality of state Blue Sky laws. *See, e.g., Edgar v. MITE Corp.*, 457 U.S. 624, 641 n. 16, 102

---

1. The states' responses were varied and included a number of additional concerns. For example, some states curtailed their investigations or limited them due to the SEC's investigation of the matter. *See* 1989 Tr. at 49; Pl. ex. 98 (Virginia); Glickman Deposition at 57 (Massachusetts). Also, many states continue to seek payment directly from the Funds' advisors rather than the Funds. *See* Nov. 7 Tr. at 7–8 (Massachusetts); Pl. ex. 37 (Connecticut, seeking $17,000 against SSC and Steadman); Plaintiff's exs. 26 and 28 (California, seeking payment from SSC and Steadman and indicating that its calculation of the statutory penalties is $290,000); Pl. ex. 50 (Kentucky, reserving right to proceed against SSC and Steadman).

Some states also sought specific information identifying shareholders or sales data prior to 1984. *See, e.g.* Pl. ex. 23 (Arizona); Pl. ex. 48 (Kansas). States in addition expressed concern over defendants' representation of sales only after 1984. For example, Alan Ford, the Assistant Director of Enforcement of the Office of the Securities Commissioner of Kansas, stated that defendants had informed the Commissioner that sales to Kansas residents after 1984 totalled $300 and that, only upon his own investigation had he discovered that as of 1988, residents of Kansas maintained open accounts with the Funds totalling $355,482. Affidavit of Alan Ford (August 3, 1989) at ¶ 12.

S.Ct. 2629, 2640 n. 16, 73 L.Ed.2d 269 (1982).

■ States may enforce Blue Sky laws over any person or corporation over whom they may assert personal jurisdiction. Personal jurisdiction is established where a person or corporation has "minimal contacts" with a forum sufficient to avoid offending a "traditional conception of fair play and substantial justice" under the due process clause of the Fourteenth Amendment. *International Shoe Co. v. Washington*, 326 U.S. 310, 320, 66 S.Ct. 154, 160, 90 L.Ed. 95 (1945). Purposeful direction of activities towards a forum state creates such "minimal contacts." *See, e.g., Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774, 104 S.Ct. 1473, 1478, 79 L.Ed.2d 790 (1984). In addition, a person or corporation who "purposefully derives benefits" from contacts with other states is subject to jurisdiction in those states. *See Kulko v. Superior Court of California*, 436 U.S. 84, 96, 98 S.Ct. 1690, 1699, 56 L.Ed.2d 132; *reh. denied*, 438 U.S. 908, 98 S.Ct. 3127, 57 L.Ed.2d 1150 (1978). Defendants, who sold the majority of the Funds' shares to residents of the states, purposefully derived benefits from interstate activity. More to the point, as early as 1950 the Supreme Court upheld a state's application of its Blue Sky laws and jurisdiction over an out-of-state corporation that had no offices or agents and conducted no advertising in that state, and obtained new customers only by referrals from existing customers. *Travelers Health Ass'n v. Virginia*, 339 U.S. 643, 70 S.Ct. 927, 94 L.Ed. 1154 (1950).

■ The states themselves do not exempt the Funds from their Blue Sky laws simply because they maintain no sales personnel or offices outside the District of Columbia. The Uniform Securities Act of 1956, which has been adopted by a substantial majority of the states, makes it unlawful "to offer or sell" any unregistered securities "in this state," unless otherwise exempted. *See* Uniform Securities Act § 301, 7B U.L.A. 550 (1985). The definition of "offer" includes a "solicitation of an offer to buy." *See id.* at § 401(j)(2), 7B U.L.A. 580 (1985). The Uniform Securities Act

considers an offer to be made "in this state" when "the offer ... is directed by the offeror to this state and received at the place to which it is directed (or at any post office in this state in the case of a mailed offer)." *Id.* at § 414(c), 7B U.L.A. 673 (1985). By sending prospectuses and applications, whether solicited or unsolicited, to residents of various states, defendants solicited offers to buy, and therefore made "offers" under the Uniform Securities Act, regardless of any statement to the contrary in the Funds' prospectuses.

Accordingly, it is undisputed that defendants were subject to enforcement of state registration laws. Defendants, however, take no position on whether they were legally required to register with the states, arguing instead that their decision not to register exempts them from any requirement of payment of fees, since the state requires payment only *upon* registration. This argument is, at best, specious. Had defendants registered as required, they would have been liable for fees. The omission of fees from their financial statements understated defendants' obligations under state Blue Sky laws. Moreover, as discussed *infra*, III–A, fees might have been the most reasonable minimal estimate defendants could have made of contingent liabilities resulting from the failure to register.

The most telling evidence that defendants' decision was legally unjustified comes from the states themselves. Twenty-five states sought monetary relief against the Funds. *See* Katcher decl. at ¶ 1. Had defendants not represented that they intended to liquidate the Funds while instead seeking a transfer of assets, the number of states seeking financial payment from the Funds would have been even higher. *See, e.g.* Brown aff. at ¶ 4. Moreover, other states sought consent decrees or cease and desist orders against defendants. Still more states sought monetary relief against SSC and Steadman. It is probable that states' concerns about depletion of shareholders' assets for violations of state securities laws for which the shareholders did not bear ultimate respon-

sibility further limited the monetary relief sought by the states against the Funds. *See also* Pl. exs. 5–10 (discussing states' concerns with depleting shareholder assets generally).

## III.

■ The securities laws prohibit any person from using any device, scheme, or artifice in the offer and sale of securities to defraud a purchaser of securities. *See* 15 U.S.C. 77q(a), 78j(b); 17 C.F.R. 240.10b–5. Section 17(a) of the Securities Act, section 10(b) of the Exchange Act, and rule 10b–5 under the Exchange Act prohibit substantially the same fraudulent conduct. *See United States v. Naftalin*, 441 U.S. 768, 778, 99 S.Ct. 2077, 2084, 60 L.Ed.2d 624 (1979). To prove a violation of these antifraud provisions, the SEC must establish: (1) that the defendant made material misrepresentations and omissions, (2) that the defendant acted with scienter, and (3) that the fraudulent practices were in the offer, purchase, or sale of securities. *See, e.g., Aaron v. SEC*, 446 U.S. 680, 697, 100 S.Ct. 1945, 1956, 64 L.Ed.2d 611 (1980); *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 448, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). The SEC is not required to show these elements by clear and convincing evidence but must show them by a preponderance of the evidence. *See Steadman v. SEC*, 450 U.S. 91, 102, 101 S.Ct. 999, 1008, 67 L.Ed.2d 69, *reh. denied* 451 U.S. 933, 101 S.Ct. 2008, 68 L.Ed.2d 318 (1981) (involving same parties). As explained below, the SEC has established that defendants, acting with scienter, made material misrepresentations and omissions in the offer and sale of securities.

### A.

First, defendants' misstatements were material. Plaintiff and defendants agree that *TSC Industries v. Northway Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976) establishes the legal standard for materiality to be applied here. There the Court stated:

> An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important.... What the standard contemplates is a showing of a substantial likelihood that, under all of the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

*Id.* at 449, 96 S.Ct. at 2132; *see also Basic Inc. v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988).

The SEC argues that defendants' failure to recognize liabilities in an amount at least equivalent to unpaid registration fees, which the SEC estimates range from $694,020 to $3.4 million, constitutes a material misstatement in defendants' financial statements. Defendants do not dispute the SEC's estimate of unpaid fees. Instead, defendants assert that they are not liable for fees, but rather for penalties imposed for non-registration. Defendants contend that they were not required to book or disclose the liabilities under generally accepted accounting principles and thus cannot be held liable under securities laws for any misstatement. Alternatively, defendants argue that, since financial penalties imposed in all but six states amounted to $100,646 and that amount is not material, no reasonable estimate of contingent liabilities in earlier years would have been material.

■ The SEC and defendants each presented expert testimony on accounting practices in support of its argument. Each expert testified as to accounting definitions of materiality, requirements for booking contingent liabilities, and requirements for disclosure (in a footnote) of contingent liabilities that cannot be accurately estimated to the degree necessary to book them. However, the testimony did not conflict in any significant aspect. Thomas Weirich, plaintiff's expert, stated that accountants

use 3–7% of net income [2] as a starting point for determining a material amount. 1990 Tr. I at 73. Stanley Scott, defendants' expert, stated that he uses a rule of thumb that anything less than 5% is not material. 1990 Tr. II at 37–38. Neither expert, however, has experience auditing clients in the mutual fund industry and both acknowledged that it is important for an accountant to be familiar with the relevant industry in auditing a client's books. 1990 Tr. I at 74; 1990 Tr. II at 48–49. Gene Gohlke, Acting Director of the Division of Investment Management at the SEC, testified that in the mutual fund industry the most important indicator of materiality is NAV, which is calculated daily to the nearest penny. 1990 Tr. I at 16–18.[3] Defendants did not produce any testimony specific to the mutual fund industry in contradiction of Gohlke's testimony. Moreover, it is judicially noticeable and undisputed that financial publications (e.g., The Wall Street Journal) report daily changes of one cent or more in mutual fund shares. Applying a legal, rather than an accounting, standard of materiality, plaintiffs have demonstrated and defendants have failed to refute that a reasonable shareholder of mutual fund shares would find an omission of one cent or more per share material.

Moreover, the experts' testimony did not conflict with respect to accounting standards for booking or disclosing contingent liabilities. Both experts testified that any contingent liability that (1) is probable and (2) can be estimated, must be booked under Financial Accounting Standard No. 5

("FASB No. 5"). If a range, rather than a specific number, can be estimated, the lower end of the range must be booked. On the other hand, if a contingent liability is probable or reasonably possible, but not estimable, it must be disclosed in financial statement footnotes. However, the experts (again, neither of whom are experts in the mutual fund industry) offered disputing opinions of what defendants should have booked or disclosed in this situation. Weirich believed that defendants incurred actual liabilities in the amount of the unpaid fees, which they should have booked, and contingent liabilities in the amount of the fines and penalties, which they should have booked if they could be estimated, or disclosed, if they could not be estimated. 1990 Tr. I at 65 & 68; Designated Deposition of Thomas Weirich ("Weirich dep.") at 73–74. In contrast, Scott believed that defendants incurred no actual liabilities and that accounting standards did not require defendants to book any contingent liabilities for fees or penalties because they were not estimable. 1990 Tr. II at 36, 40 & 43.[4]

▮ Under normal accounting practices (which provide some insight into the concerns of a reasonable shareholder), had defendants registered with the states as required, fees would have been disclosed as expenses and liabilities in defendants' financial statements. Nov. 7 tr. at 65. Therefore, and in light of the fact that many states based their imposition of penalties on fees that would have been paid

---

**2.** *See* Nov. 7 Tr. at 80. However, Weirich later referred to 3–7% of net worth. Nov. 7 Tr. at 81.

**3.** Since the Funds' net worth dropped from $130 million to $25 million between 1971 and 1989, and any liabilities for failure to register grew during that same period, no single calculation of liabilities in cents per share or percentage of total assets can be computed. The SEC calculated defendants' cumulative contingent liability for fees alone per share for each fund for each year that fund was unregistered. *See* Smith Decl. at ¶¶ 11–12. The results show for example that, had defendants registered and paid fees, NAV for the Oceanographic Fund would have been lower by 1.4 cents per share in 1973, 7.6 cents per share in 1970, and 18 cents per share in 1987. *See id.* at 12.

**4.** Scott also testified that he believed that defendants were not required under accounting standards to book contingent liabilities because they were not aware of those liabilities. 1990 Tr. II at 42–45. He added, however, that if management did not have knowledge of liabilities, but later learned that such liabilities were probable or reasonably possible, they would then be required to book or disclose them. *Id.* at 54. While it is true for purposes of accounting practice that it would have been impossible for defendants to book or disclose a liability of which they had no knowledge, a finding of scienter pursuant to the securities laws does not require actual knowledge. *See infra*, III–B.

had defendants registered, plaintiff's argument that the omitted fees would have constituted a reasonable estimate of liabilities is well taken. In contrast, defendants' argument that any reasonable estimate of liabilities—before defendants represented to the states that they intended to liquidate and attempted settlement with the states on that basis—was no greater than $100,646, must fail. Some states could have imposed penalties from $5,000 to $25,000 *per sale* of unregistered securities. Moreover, the Funds' settlement with the states did not eliminate potential rescission claims on behalf of current, resident shareholders. Finally, the Funds have likely incurred substantial legal fees in settling with the states and in defending this action.[5] Accordingly, in earlier years, a reasonable estimate of liabilities resulting from defendants' failure to register would have been greater than the amount indicated by the Funds' 1989–1990 monetary settlement with forty-four states. The SEC demonstrated that the amount of back fees was estimable. Since the states' demands for monetary settlement were based on back fees, under applicable accounting principles, defendants should have booked at least the fees owed as a minimum estimate of contingent liability and disclosed information about potential maximum liabilities in a footnote. Even if defendants had decided at that time that a minimum was not reasonably estimable, they should have discussed potential liabilities in a footnote. A reasonable shareholder of the Funds would find it material that defendants' failure to register under state Blue Sky laws subjected the Funds to large potential liabilities, counting penalties, rescission suits, and legal fees. Moreover, a reasonable law-abiding shareholder would find it material that the Funds were violating state laws even if the likelihood of incurring financial loss from those violations was less than probable.

## B.

■ Second, defendants acted with scienter. Scienter includes not only intentional deception, but also reckless conduct that " 'presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.' " *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1045 (7th Cir.) (citation omitted), *cert. denied*, 434 U.S. 875, 98 S.Ct. 224, 225, 54 L.Ed.2d 155 (1977); *see Dirks v. SEC*, 681 F.2d 824, 844–45 (D.C.Cir.1982), *rev'd on other grounds*, 463 U.S. 646, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983); *Sharp v. Coopers & Lybrand*, 649 F.2d 175, 193 (3d Cir.1981), *cert. denied*, 455 U.S. 938, 102 S.Ct. 1427, 71 L.Ed.2d 648 (1982); *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 46 (2d Cir.), *cert. denied*, 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978); *see also Drexel Burnham Lambert, Inc. v. Commodity Trading Futures Comm.*, 850 F.2d 742, 748 (D.C.Cir.1988) (holding that recklessness satisfies requirement for scienter under § 4(b) of the Commodity Exchange Act, 7 U.S.C. § 6(b) and noting virtually unanimous agreement among circuits that recklessness satisfies scienter requirement for 10(b)–5 fraud). Gohlke testified that state securities representatives, discussing defendants position that registration was unnecessary, found defendants' position "laughable." Gohlke Dep. at 55–58. Furthermore, the standard for scienter under the securities laws is not altered, as defendants suggest, by the accounting experts' testimony that defendants are not required by accounting standards to have booked or disclosed any liabilities they did not have actual knowledge of. *See* 1990 Tr. I at 78–79; 1990 Tr. II at 42–45. Neither did defendants' disclosure in applications and prospectuses that the Funds were not registered under "the local laws of the various states" relieve them of their fiduciary obligation to fully inform shareholders of the risks attached to the Funds' non-registration. Indeed, Peter Smith of the SEC testi-

---

**5.** The SEC produced evidence derived from financial reports filed by the Funds with the SEC tending to support such an inference. That evidence showed that the Funds' legal fees totalled approximately $36,000 in 1986, $33,000 in 1987, $92,000 in 1988, and $408,000 in 1989. *See* Nov. 7 tr. at 54; Pl. ex. 102.

fied that when he reviewed defendants' prospectuses during the 1980's he was confused by that clause and interpreted it as a reference to municipal or county law, rather than state law. *See* 1990 Tr. I at 59. Defendants, including Steadman, a graduate of the Harvard Law School with approximately four decades of legal and managerial experience in the mutual fund industry, knew or should have known (and do not now dispute) that the failure to register was illegal. Notwithstanding, defendants failed to disclose any implications of the Funds' non-registration and failed to record any of the resulting liability, thereby deceiving purchasers of the Funds.

■ Defendants nevertheless assert that their failure to provide for the costs of not registering the Funds derived directly from their decision not to register, which decision was made in reliance on the advice of counsel, supposedly rendered in 1970 or 1971. Reliance on the advice of counsel is not an automatic defense that would operate to justify defendants' failure to recognize the liabilities and to accrue and disclose them. *See SEC v. Savoy Industries, Inc.*, 665 F.2d 1310, 1314 n. 28 (D.C.Cir. 1981). In any event, defendants produced scant evidence in support of this assertion. Defendants produced neither the opinion letter on which they relied nor called the author of that letter, Mr. Carl Shipley, to testify either in August, 1989 or in November, 1990, even though Mr. Shipley provided legal advice to defendants as recently as 1988.

Instead, defendants produced an undated, unsigned letter on SSC stationary addressed to the Steadman American Industry Fund from Carl L. Shipley, General Counsel. The letter was located in a file containing materials provided to directors of the Funds for the September 25, 1974 meeting at which the directors resolved to distribute shares on a mail order basis (several years after the Funds began doing so). The single page letter opined that state registration was unnecessary because the application form investors signed provided that only D.C. and federal law applied to the transaction and also because the Funds did not "do business" or "offer to sell" in any state. The letter further stated: "This precise issue has never been adjudicated by the Supreme Court and the outcome is not predictable, should it ever be." The letter cited the Uniform Commercial Code, various securities laws, Amendments I, V, and XIV of the United States Constitution, and five unnamed, undated Supreme Court citations.

The letter's statement that the Supreme Court had not decided this issue is flatly erroneous in light of *Travelers Health Ass'n v. Virginia*, 339 U.S. 643, 70 S.Ct. 927, 94 L.Ed. 1154 (1950), in which the Court upheld a state's application of its Blue Sky laws to a company which operates on a mail order basis in the state but does not advertise or solicit business there. The letter also asserts that defendants operating on a mail order basis would not "do business" in any state but fails to cite or discuss *International Shoe Co. v. Washington*, 326 U.S. 310, 320, 66 S.Ct. 154, 160, 90 L.Ed. 95 (1945) or any of the extensive line of cases following *International Shoe*. In addition, the letter takes the position, contrary to law, that states could not impose Blue Sky laws on the Funds' sales due to what resembles a forum selection clause in the application form. The unnamed cases in the letter are revealed upon further examination to be *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 83 S.Ct. 1210, 10 L.Ed.2d 248, *reh. denied*, 374 U.S. 858, 83 S.Ct. 1861, 10 L.Ed.2d 1082 (1963); *Campbell v. Hussey*, 368 U.S. 297, 82 S.Ct. 327, 7 L.Ed.2d 299 (1961), *reh. denied, Berry v. United States*, 368 U.S. 1005, 82 S.Ct. 596, 7 L.Ed.2d 547 (1962); *Missouri Pac. R. Co. v. Porter*, 273 U.S. 341, 47 S.Ct. 383, 71 L.Ed. 672 (1927); *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947); and *H.P. Hood & Sons, Inc. v. DuMond*, 336 U.S. 525, 69 S.Ct. 657, 93 L.Ed. 865 (1949). Controlling authority at the time directly related to state Blue Sky laws renders these authorities, which concern the Commerce Clause and federal preemption of state statutes, plainly inapplicable to the questions presented by the Funds' change in business.

Defendants also produced a second example of Shipley's opinion in the form of a letter dated May 31, 1988 from Mr. Shipley to David S. Ruder, Chairman of the SEC, apparently written after the SEC highlighted defendants' failure to register in its investigation of them. Shipley's 1988 letter, without citation of any authority, states in part:

> The Funds submit that they have a Constitutional right to engage in business in interstate commerce. The Funds also have a Constitutional right to be the architect of the form of business structure and conditions under which they will do business within the framework of the 1940 Act. Shareholders have a Constitutional right to enter into the contract contained in the Funds' application ... The Federal Constitution prohibits impairment of the obligations of the contracts between the Steadman Funds and their shareholders by state or federal government action.

*See* Defendants' Memorandum in Opposition to Plaintiff's Motion for Summary Judgment (October 26, 1990), Exhibit J.

Steadman testified that the single page letter from Shipley found in files associated with the 1974 meeting was not that relied on by defendants in 1971. The original multi-page letter, he stated, cited cases and did not indicate that the outcome of the issue in the Supreme Court was uncertain. 1990 Tr. I at 108. Nevertheless, the unsigned 1974 letter together with the 1988 letter to David Ruder constitute the best evidence available of the substance of the advice given by Mr. Shipley and relied on by defendants. Reliance on these opinions that black is white without more would have been reckless. Furthermore, defendants' assertion that they were justified in relying on Mr. Shipley's opinion in 1974 is weakened by the fact that, at the time, the author was an officer (general counsel) of three of the funds and a director of a fourth fund. Defendants have not controverted plaintiff's showing that their decision not to register or their failure to book against resulting liabilities was undertaken either knowingly or recklessly. If they were not aware that the Funds' NAV was understated or that shareholders would have a material interest in, at a minimum, disclosure of the existence of the potential liabilities, defendants—investment managers with the responsibility for a fund of over $25 million dollars with over 25,000 shareholder accounts—were reckless in failing to question the erroneous legal advice on which they purported to rely.

### C.

Third, defendants perpetuated fraud in connection with the offer and sale of securities by sending potential purchasers prospectuses and applications containing the material misrepresentations and omissions. The Supreme Court has held that the "offer or sale" requirement should be construed broadly so as to encompass fraud in any part of the selling process. *See United States v. Naftalin,* 441 U.S. at 772–73, 99 S.Ct. at 2081.

### IV.

### A.

Defendants' conduct in misstating NAV to shareholders must also lead to judgment against them for charges alleged in counts two, three and four. In count two, SEC alleges that SSC, aided and abetted by Mr. Steadman, violated sections 206(1) and (2) of the Advisers Act, which prohibit use of the mails or interstate commerce in similar fraudulent conduct by investment advisers. *See* 15 U.S.C. 80b–6(1), (2). As a registered investment adviser, SSC violated both its fiduciary duty to the Funds' shareholders and its contractual duty to the Funds by making material misrepresentations and omissions in the Funds prospectuses. Mr. Steadman's aiding and abetting liability is premised upon his admission that he possessed "ultimate supervisory authority over SSC." *See* Smith Aff. at ¶ 6. Accordingly, defendants violated §§ 206(1) and (2) of the Advisers Act.

In count three, SEC claims that defendants violated section 22(c) of the ICA, 15 U.S.C. § 80a–22(c) and Rule 22c–1, 17 C.F.R. § 270.22c–1, by selling securities at an inflated NAV. For the reasons ex-

plained above in count one, the SEC's claims must succeed. Similarly, in count four, defendants also violated section 34(b) of the Investment Company Act by filing reports with the SEC that misstated both the Funds' NAV and net assets. *See* U.S.C. 80A–33(b); Smith Aff. at ¶¶ 28–31.

### B.

In count five, the SEC alleges that defendant SSC performed investment advisory services for the Funds from November 16, 1985 to May 21, 1986 without an investment advisory agreement authorized by the shareholders or the boards of trustees of the Funds. Such an agreement is required by section 15(a) of the ICA, 15 U.S.C. § 80a–15(a). Section 15(a) provides in relevant part that

> It shall be unlawful for any person to serve or act as investment advisor of a registered investment company, except pursuant to a written contract, which contract … has been approved by the vote of a majority of the outstanding voting securities of such investment company, and— …
>
> (2) shall continue in effect for a period more than two years from the date of its execution, only so long as such continuance is specifically approved at least annually by the board of directors or by vote of the outstanding voting securities of such company;

> .　　.　　.　　.　　.

Defendants produced an investment advisory agreement executed on April 28, 1980. 1989 Steadman Decl., ex. 1. At a shareholders meeting held on February 28, 1984, shareholders of the Steadman Associated Fund voted to approve a new investment advisory agreement. Defs. ex. 10. At shareholders meetings held in June and July, 1984, shareholders of the other four Funds similarly voted to approve new investment advisory agreements. Defs. exs. 8–9 & 11–12. However, defendants failed to demonstrate that any new investment advisory agreement was executed in 1984 pursuant to the shareholders' approval. Accordingly, defendants' contention that the agreement was approved for two years

must fail, since there is no evidence of any new agreement and, pursuant to § 80a–15(a)(2), the 1980 agreement remained in effect only with specific annual approval by the boards of directors or the shareholders. On November 15, 1984, the trustees of at least four of the Funds approved the renewal of the investment advisory agreement for one year. Pl. ex. 15. Following that approval, plaintiffs allege and defendants do not refute that neither the trustees nor the shareholders again approved renewal of the agreement until May 21, 1986. Pl. ex. 17. Defendants do not dispute that SSC acted as an investment advisor between November 15, 1985 and May 21, 1986. Accordingly, SSC violated § 80a–15(a)(2) during that period of time.

### C.

In count six, SEC alleges that defendant SSC, aided and abetted by Steadman as Chairman of the Board, President, and Treasurer of SSC, violated Rules 206(4)–2(a)(2)(ii) and (a)(5), 17 C.F.R. § 275.206(4)–2(a)(2)(ii) and (a)(5), promulgated pursuant to section 206(4) of the Adviser's Act, 15 U.S.C. § 80b–6(4). Rule 206(4)–2(a)(2)(ii) provides that an investment advisor shall maintain any funds in which a client has any beneficial interest in accounts in the name of the investment advisor as agent or trustee for such clients. Subsection (a)(5) provides that all funds of clients shall be verified by an independent public accountant at least once during each calendar year "at a time that shall be chosen by such accountant without prior notice to the investment advisor." Subsection (a)(5) further provides that the accountant performing the annual surprise verification of funds shall certify that the examination was made and as to its extent and nature, and attach that certification to a Form ADV–E filed promptly with the Commissioner following the verification.

SEC alleges that SSC, aided and abetted by Steadman, accepted subscription monies from shareholders and transferred those monies from SSC's bank account to the Funds' custodian bank account. SEC also alleges that SSC accepted the proceeds of

redemption orders from the Funds' bank custodian, transferred them from the custodian bank account to SSC's bank account, and then transferred them to fund shareholders who redeemed their shares. SEC claims that SSC and Steadman did not maintain those monies in accounts in the name of SSC as agent or trustee for the funds, and failed at any time prior to 1990 to arrange for a verification of Fund monies in SSC's custody or for certification of that verification.

Defendants argue that SSC's custody of monies in the SSC subscription account and the SSC redemption account is not subject to the provisions of Rules 206(4)–2(a)(2)(A) and (a)(5), because the Funds have no beneficial interest in those monies. However, it is unclear who does have an interest in subscription or redemption monies if not the Funds. Defendants do not dispute that no surprise verification or certification took place. *See* 1990 Tr. I at 96. Instead, defendants argue that § 80b–6(4) can only be violated where an adviser intended to defraud, manipulate, or deceive its clients. Defendant cites no authority for this proposition. The statute on its face states that "it shall be unlawful ... (4) to engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative." 15 U.S.C. § 80b–6. Moreover, Rule 206(4)–2(a) explicitly defines what acts "shall constitute" fraudulent, deceptive, or manipulative practice. Thus, the statute and the rule are each worded so as to suggest that intent is not required. Accordingly, SSC, aided and abetted by Steadman, violated § 206(4) of the Advisers Act.

### D.

In the seventh count, SEC alleges that SSC, which was registered with the SEC as an investment advisor, failed to file a Form ADV with the SEC between March 31, 1986 and July 15, 1988. Rule 204–1(a)(1), promulgated pursuant to Section 204 of the Adviser's Act, requires every investment advisor registered on January 1, 1986 to file a complete Form ADV not later than March 31, 1986. *See* 15 U.S.C. § 80b–4; 17 C.F.R. § 275.204–1(a)(1). Defendants concede that no form was filed prior to July

15, 1988, but assert that the SEC has not alleged that any delay in filing the form deceived or injured any person. However, nothing in the statute or regulation indicates that injury or deception must be shown and defendants cite no authority for that proposition. Accordingly, SSC violated § 204 of the Adviser's Act and Rule 204–1(a)(1) promulgated thereunder.

### E.

Rule 17Ad–13(a), 17 C.F.R. § 240.17Ad–13(a), promulgated pursuant to section 17A(d)(1) of the Exchange Act, 15 U.S.C. § 78q–1(d)(1) provides that:

> every registered transfer agent, except as provided in paragraph (d) of this section, shall file annually with the Commission ... a report ... prepared by an independent accountant concerning the transfer agent's system of accounting control and related procedures for the transfer of record ownership and the safeguarding of related securities and funds.

In count eight, SEC alleges that SSC is registered with the SEC as a transfer agent for the Funds, is not subject to any exemption provided in subsection 13(d), and failed to file any report conforming to the requirements of subsection 13(a) as required from June 10, 1984 until October, 1990. SSC does not dispute that Rule 17Ad–13(a) applies to it and concedes that it did not file transfer agency reports as required under the rule for the years 1984–1989. *See* 1990 Tr. I at 97–98. SSC asserts that its accountant at Coopers & Lybrand audited its system of accounting of control each year and found no deficiencies, and again, that its practices did not deceive or injure any person. Nevertheless, SSC violated 15 U.S.C. § 78q–1(d)(1), and 17 C.F.R. § 240.17Ad–13(a).

### V.

Injunctive relief for securities violations is appropriate where there is a likelihood that a violation of the securities laws will be repeated. *See United States v. W.T. Grant Co.,* 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953). The standard

for injunctive relief is "quite different from the common law equity bases for an injunction and no showing of irreparable injury is required." *SEC v. General Refractories Co.,* 400 F.Supp. 1248, 1254 (D.D.C.1975). A likelihood of future violations of securities laws can be inferred from fraudulent past conduct. *See SEC v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1100 (2d Cir. 1972); *SEC v. Washington County Utility District,* 676 F.2d 218, 227 (6th Cir.1982); *SEC v. Keller Corp.,* 323 F.2d 397, 402 (7th Cir.1963). And voluntary cessation of securities violations, though relevant, is not determinative of whether such repetition is likely. *See, e.g., W.T. Grant Co.,* 345 U.S. at 632–33, 73 S.Ct. at 897; *Hecht Co. v. Bowles,* 321 U.S. 321, 327, 64 S.Ct. 587, 590, 88 L.Ed. 754 (1944); *Walling v. Helmerich & Payne Inc.,* 323 U.S. 37, 43, 65 S.Ct. 11, 14, 89 L.Ed. 29 (1944).

Our Court of Appeals has directed district courts deciding whether to grant injunctive relief for securities violations to consider "whether a defendant's violation was isolated or part of a pattern, whether the violation was flagrant and deliberate or merely technical in nature, and whether the defendant's business will present opportunities to violate the law in the future." *SEC v. First City Financial Corp.,* 890 F.2d 1215, 1228 (D.C.Cir.1989). Defendants knowingly failed to register under state Blue Sky laws for seventeen years and recklessly omitted from the Funds' financial statements any liabilities or disclosure of potential liabilities resulting from their failure to register under state law. SSC, aided and abetted by Steadman, also failed to file required reports with the SEC, failed to obtain approval of an investment advisory contract as required, and failed to arrange for surprise verification of accounts in which client funds were maintained. Defendants have violated securities laws in the past. *See Steadman v. SEC,* 450 U.S. 91, 101 S.Ct. 999, 67 L.Ed.2d 69, *reh. denied* 451 U.S. 933, 101 S.Ct. 2008, 68 L.Ed.2d 318 (1981). Therefore, defendants' violations are not isolated nor merely technical in nature. Defendants continue to manage the Funds. Accordingly, even though defendants now recognize

some liabilities resulting from their failure to register under state Blue Sky laws and have filed reports as required with the SEC since the SEC's investigation of them, there is "some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive." *W.T. Grant Co.,* 345 U.S. at 633, 73 S.Ct. at 897.

The decision whether to grant injunctive relief "is addressed to the sound discretion of the district court," *SEC v. Caterinicchia,* 613 F.2d 102, 105 (5th Cir.1980), but the evidence must be viewed in the light most favorable to the SEC. *See, e.g., SEC v. Warner,* 674 F.Supp. 836, 840 (S.D.Fla. 1987). The evidence set forth in the affidavits and adduced through oral testimony entitles the SEC to injunctive relief to prevent defendants from committing future violations of federal securities laws. An accompanying order issues judgment for plaintiff on all claims and requests further submissions regarding the form of a permanent injunction.

## MEMORANDUM ON MOTION FOR STAY

On February 27, 1991, this Court issued a Memorandum and Order granting judgment for plaintiff on all claims in this matter. The Court found that injunctive relief was warranted. Pursuant to that Order, the parties have submitted proposed injunctions and comments regarding the proposed injunctions. Meanwhile, defendants have filed a notice of appeal. In conjunction with their appeal, defendants move for a stay of the injunction pending resolution of the appeal.

Determination of whether a stay is warranted pending appeal requires consideration of "(1) the likelihood that the party seeking the stay will prevail on the merits of the appeal; (2) the likelihood that the moving party will be irreparably harmed absent a stay; (3) the prospect that others will be harmed if the court grants the stay; and (4) the public interest in granting the stay." *Cuomo v. United States Nuclear Regulatory Commission,* 772 F.2d 972,

974 (D.C.Cir.1985), citing *WMATA v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C.Cir. 1977). To decide whether to grant a stay, courts weigh these factors. Thus, "[a] stay may be granted with either a high probability of success and some injury, or *vice versa.*" *Cuomo*, 772 F.2d at 974.

■ Defendants argue that, pursuant to Section 9(a) of the Investment Company Act of 1940, 15 U.S.C. § 80a–9(a), an injunction will force defendants Charles Steadman and the Steadman Security Corporation (SSC) to terminate their investment-advisory business. Defendants further assert that the SEC is considering pursuing administrative proceedings against them after the injunction is entered that would bar them from acting as transfer agents.

The SEC opposes defendants' motion for a stay of the injunction. First, plaintiff argues that defendants failed to demonstrate any likelihood of success on the merits. Second, it argues that a stay will not serve the public interest in preventing securities violations. In addition, the SEC notes that defendants' violation of the securities laws harmed the Funds' shareholders. Citing the Court's finding that an injunction was necessary to prevent future violations, the SEC argues that a stay would disserve shareholders' interest in that prevention now. In addition, the SEC argues that defendants will not be injured by being barred from serving as investment advisors or transfer agents because any such bar is a direct result of defendants actions, which this Court found to have violated the securities laws.

The SEC further argues that the shareholders have an interest in obtaining new management of the Funds because of the Funds' poor performance. Defendants move to strike all arguments based on the Funds' alleged performance, arguing persuasively that this issue is not relevant. The purpose of the injunction to be entered is to prevent any further violation of securities laws by defendants, not to provide for improved management of the Funds' assets. Therefore, regardless of whether or not the SEC's concern about defendant's management of the Funds' assets is justified for reasons unrelated to this lawsuit, defendants' management and any injury suffered by shareholders as a result of it has no direct bearing on whether a stay of the injunction is appropriate here.

Defendants' request for a stay is justified based on the criteria identified in *Cuomo*. As to defendants' prospect of success on appeal, while this Court is naturally satisfied that its decision on the merits and with respect to relief were correct and that none of the arguments available to defendants on appeal have merit, the result on an appeal in a matter of this complexity is difficult to predict.

Furthermore, the SEC's contentions that defendants will not be severely injured by this injunction and that the public will be harmed by a stay are not convincing. Defendants, who have served as investment advisors and transfer agents in the mutual fund industry for decades, will be seriously injured by an injunction that results in a bar to their continued service in the industry. That injury will be irreparable because, once defendants are shut out of the industry, it is doubtful that, should the injunction be lifted, they would be able to regain positions in the industry as investment advisers, much less the positions they hold today. Finally, while an injunction is required long-term to assure defendants' future compliance with the securities laws, the risk to shareholders and to the public interest that they would violate those laws while their appeal is pending is an acceptable one.

Accordingly, an accompanying Order grants defendants' motion for a stay pending appeal.

## PERMANENT INJUNCTION

For the reasons stated in the Memorandum and Order dated February 27, 1991, this Court: has found that defendants Charles W. Steadman ("Steadman"), Steadman Security Corporation ("SSC"), Steadman Financial Fund, Steadman Investment Fund, Steadman Oceanographic, Technology & Growth Fund, Steadman American Industry Fund, and Steadman Associated

Fund (collectively "the Funds"), have violated certain provisions of the federal securities laws; has granted judgment to plaintiff Securities and Exchange Commission ("Commission") on all claims; and has held that plaintiff is entitled to injunctive relief to prevent defendants from committing future violations of those enumerated federal securities laws. Therefore, it is this 1st day of May, 1991, hereby ORDERED that:

I. Defendants Steadman, SSC, and the Funds are permanently enjoined from making use of any means or instruments of transportation or communication in interstate commerce or any means or instrumentality of interstate commerce, or of the mails, in the offer or sale, or in connection with the purchase or sale, or any security to:

(a) employ any devices, schemes, or artifices to defraud;

(b) obtain money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(c) engage in any act, transaction, practice, or course of business which operates or would operate as a fraud or deceit upon any person;

in violation of Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a), Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b) and Rule 10b-5, 17 C.F.R. 240.10b-5 thereunder.

II. Defendants Steadman and SSC, are permanently enjoined from making use of the mails or any means or instrumentality of interstate commerce to violate or aid and abet violations of Sections 206(1) and 206(2) of the Investment Advisors Act of 1940 ("Advisors Act"), 15 U.S.C. § 80b-6(1) and 80b-6(2), by:

(a) employing any device, scheme, or artifice to defraud any investment advisory client or prospective client; or

(b) engaging in any transaction, practice or course of business which operates as a fraud or deceit upon any invest-

ment advisory client or prospective client.

III. Defendants Steadman and the Funds are permanently enjoined from selling, redeeming, or repurchasing the shares of any registered investment company at prices not based upon the current net asset value of such security computed after receipt of a tender of such security for redemption or of an order to purchase or sell such security, or aiding and abetting the foregoing, in violation of Section 22(c) of the Investment Company Act of 1940 ("ICA"), 15 U.S.C. § 80a-22(c), and Rule 22c-1, 17 C.F.R. 270.22c-1 thereunder.

IV. Defendants Steadman, SSC, and the Funds are permanently enjoined from making any untrue statements of a material fact or omitting to state any fact necessary in order to prevent the statements made therein, in light of the circumstances under which they are made, from being materially misleading, in any registration statement, application, report, account, record or other document filed or transmitted pursuant to the ICA, 15 U.S.C. § 80a-1 to 80a-52, or the keeping of which is required pursuant to Section 31(a) of the ICA, 15 U.S.C. § 80a-30(a), in violation of Section 34(b) of the ICA, 15 U.S.C. § 80a-33(b).

V. Defendant SSC is permanently enjoined from undertaking investment advisory services for a registered investment company except pursuant to a written contract that has been approved by a vote of a majority of the outstanding securities of such registered investment company, and that has continued in effect for a period not more than two years from the date of its execution, or pursuant to the specific approval of a contract providing for advisory services, on an annual basis, by a majority of the investment company's board of directors or by a vote of a majority of the outstanding voting securities of such investment company, in violation of Section 15(a) of the ICA, 15 U.S.C. § 80a-15(a).

VI. Defendants Steadman and SSC are permanently enjoined from maintaining custody of, and taking action with respect to, funds or securities of investment advisory clients, or aiding and abetting the fore-

going, without (a) maintaining such funds in bank accounts maintained in the name of the investment adviser as agent or trustee for the client; and/or (b) arranging to have such funds and securities verified by means of an annual surprise audit by an independent accountant and having a certificate of verification filed promptly with the Commission, in violation of Section 206(4) of the Advisers Act, 15 U.S.C. § 80b–6(4), and Rules 206(4)–2(a)(2)(ii) and (a)(5), 17 C.F.R. 275.206(4)–2(a)(2)(ii) and (a)(5) thereunder.

VII.  Defendant SSC is permanently enjoined from failing to file with the Commission a compete Form ADV, in violation of Section 204 of the Advisers Act, 15 U.S.C. § 80b–4, and Rule 204(a)(1), 17 C.F.R. 275.-204–1(a)(1) thereunder.

VIII.  Defendant SSC is permanently enjoined from failing to file with the Commission a report concerning its system of internal accounting and control for the transfer of record ownership and the safeguarding of related securities and funds, in violation of Section 17A(d)(1) of the Exchange Act, 15 U.S.C. § 78q–1(d)(1) and Rule 17Ad–13(a), 17 C.F.R. 240.17Ad–13(a) thereunder.